### Moritz Herschfeldt v. Paul J. George and Another.

As a general rule, a deed which is fraudulent as to existing creditors, is fraudulent as to subsequent creditors also.

Where one who was considerably indebted, caused his real estate to be conveyed to his wife, and soon thereafter contracted large debts, representing himself to be still the owner of this real estate, and within a few months failed, and made an assignment, but showing assets to less than half the amount of his debts, and there was no explanation of these facts, — *Held*, That the settlement upon the wife was fraudulent and void as to the subsequent creditors.

Where one makes a settlement upon his wife under such circumstances as, if voluntary, would render it void as to creditors, and receives from her a small and inadequate consideration, such settlement will be sustained, in equity, only so far as to secure to her the re-payment of that sum.

HERSCHFELDT *v.* GEORGE.

The homestead exemption is to be claimed, under the statute, at the time of, or after, a levy, and before sale. And when it consists of a town lot, its value is to be estimated at that time.

One can not claim, under the homestead exemption, a lot which he has caused to be conveyed to his wife, on the pretence that such conveyance was for the purpose of vesting the title in her as a homestead.

*Heard November 18th and 19th, 1858. Decided June 8th.*

Appeal in Chancery from Wayne Circuit.

The bill was filed against Paul J. George, Sally George (his wife), and John George; and sets forth: That on September 1st, 1852, Paul J. George, being indebted to complanant in $1866.61, gave complainant therefor three promissory notes, due in four, six, and seven months from date: That on March 24th, 1853, complainant caused an attachment to be issued from the Circuit Court for the county of Wayne against the property of said Paul, on the first two of said notes, which attachment was served by attaching lot 61, on the Lambert Beaubien farm, on Jefferson Avenue, Detroit, and also a part of lot 3 of subdivision of private claim number 19, being in Hamtramck, Wayne county, and was also served personally on the said Paul; and that on September 22d, 1853, judgment was rendered for complainant in the attachment suit, for $1015.07 and costs of suit: That on April 5th, 1853, complainant commenced another suit by attachment, on the third note, in which the same property was attached, and judgment rendered therein July 1st, 1853, for $920.53 and costs of suit: That executions were issued on said judgments, December 9th, 1853, and levied on said premises.

The bill further sets forth that on March 17th, 1852, said Paul was the owner in fee, jointly with John George, of the said premises, and on that day said John and wife conveyed to Paul the west half of said lot 61, and the east half of the Hamtramck lot: That on August 23d, 1851, said Paul and Sally, for the nominal consideration of $2000, conveyed to one Henry Train the west half of said lot 61; and that on July 8th, 1852, Train and wife, for the nominal

6 MICH. — 2E.

consideration of $400, conveyed the same, by deed of warranty, to said Sally: That on August 2d, 1851,, said Paul and Sally, for the nominal consideration of $500, conveyed the Hamtramck lot by warranty to Henry Zender, who, on the next day, for the nominal consideration of $1000, conveyed the same to the said Sally: That at the time of making said conveyances to Train and Zender, as complainant is informed and believes, said Paul was largely indebted in New York and elsewhere, and utterly insolvent; and that said conveyances were without consideration, and made for the purpose of defrauding the creditors of said Paul, and of preventing them from collecting their debts, and in secret trust that the lands should be conveyed to said Sally, to keep them beyond the reach of such creditors.

He further alleges that at the time of contracting the indebtedness for which said judgments were rendered, said Paul represented to complainant that he was still the owner of said premises, and it was upon the faith of such representations that complainant trusted him: That on January 31st, 1853, said Paul, with a view further to defraud creditors, gave to John George a mortgage for $1779.19 on said premises, which is charged to be without consideration.

And complainant prays that said conveyances to Train, Zender, and Sally George, and said mortgage, may be declared void as to the creditors of said Paul, and as against the lien of said executions.

Each of the defendants answered the bill separately, but John George having died pending the suit, the bill was voluntarily dismissed by complainant as to his representatives.

Complainant afterwards amended his bill by charging said several conveyances to have been made with a view to defraud subsequent creditors; and further, that in August and September, 1852, said Paul fraudulently contracted debts to the amount of nearly $10,000, including that to complainant, and that in January, 1853, he became so entirely insolvent that he made a general assignment for the benefit of

creditors, showing assets to the nominal amount of $4000, and debts to over $11,000.

The answer of Paul George admits the conveyances to Train and Zender respectively, and by them respectively to Sally George, and that the considerations named in the deeds were only nominal. Denies all the allegations in the bill as to the conveyances being made to defraud creditors, or upon fraudulent trusts, or to shield the property from attachment or levy. It then avers that on the 10th day of March, 1842, Charles Moran conveyed lot 61 to David and John George, as tenants in common, and on the 14th of the same month David conveyed to this defendant: That defendant and John procured the lot for the express purpose of building dwelling houses thereon, to be occupied by themselves and families, as homesteads; they agreeing between themselves that defendant should have for his own the west half and John the east half of the lot: That each erected on his respective half a dwelling house: That defendant moved into his in the autumn of 1842, and removed therefrom in the fall of 1853, and then only for a temporary purpose, and with the intention of returning: That from time to time prior to 1851, Sally George, his wife, importuned him to vest said west half in her as a homestead, and he promised to do so, but delayed until August, 1851, when, in order to carry out that purpose, he joined in the deed to Train; that at the time of making said deed defendant proposed making one for his half only of said lot, but it being suggested that of record the lot stood in him and John in common, and being advised that a quit-claim of the whole would convey his interest, and that on the interchange of deeds between himself and John, Train could then deed the west half to Sally George, he gave a quit-claim accordingly. He avers that, though he had determined to vest in his wife the said west half of lot 61 as a homestead, yet she, as an additional inducement thereto, offered to allow

him to receive from Train, who was administrator on the estate of her deceased father, the sum of four hundred dollars, due her from said estate, and that he actually did receive the same, and expended it in and about his business.

Defendant further says that he and John being on unfriendly terms, no communication was had between them until March 17th, 1852, at which time John and his wife deeded the west half of lot 61 to defendant, and defendant and his wife deeded the other half to John, in pursuance of said verbal partition; that Train and wife afterwards deeded said west half to said Sally; and that at the time of the partition between himself and John, when he chose and had said west half of lot 61 as a homestead, its value did not exceed $1500. And he claims that the deed from himself and wife to Train, and from Train and wife to said Sally, was an appropriate way of fixing a homestead under the laws of the state, but that even if they were void, he is still entitled to claim said premises as a homestead under the statute.

He further says the deeds between himself and John, of the Hamtramck land, were also executed in pursuance of a previous parol agreement for partition: That at the time of the deed to Zender, defendant had received a severe bodily hurt, and was in danger of not recovering; that his wife and some of his friends urged upon him that it would be right to fix in his wife the title to said Hamtramck land, and he did so — the conveyance to Zender being for that purpose. And he denies that that conveyance was made to defraud creditors: He alleges that at that time he was only indebted to his brother John, and to one or two others in small amounts; that he had sufficient assets, open, visible, and to be reached, to pay off every creditor and debt without any reference to said real estate: That after said deeds were executed, by a series of unforseen losses, he failed in business, and became unable to pay his debts. He denies the false representa-

tions charged against him in the bill; and denies all fraud or illegality, actual or intended, and any purpose to defraud any creditor whomsoever.

The answer of Sally George contains substantially the same averments as that of her husband. She claims that, ever since the conveyance of said west half of lot 61 to her, she has held and possessed, and still holds and possesses, the same as a homestead. She says that, before the deed to Zender, her husband had been severely hurt; that he was then lying ill, and that his habits had become so intemperate that she feared he would resume them upon his recovery, and that it might lead to injury to himself and his business: That she deemed it a duty to herself and her children to secure the Hamtramck land as a means of future support; that she therefore urged her husband to convey it to some one who would convey it to her, and thus vest it in her for the purpose aforesaid; that her husband assented to this, and the deeds to Zender, and from the latter to her, were made accordingly. She denies all fraudulent intent; and says that at the time of the conveyance to Train and Zender she supposed, and still believes, her husband had property enough, independent of the lands, to pay all his debts; that she knew of no debt then of any consequence, except that to John George. And she claims, as respects the west half of lot 61, the benefit of the homestead exemption.

Replications being filed to these answers, proofs were taken as follows:

*Henry Zender* proved the assignment of Paul George to himself, for the benefit of creditors, showing assets amounting to about $4000, and debts to upwards of $9000, not including the demand of John George. He testified that he took possession of the assigned property, but was only able to realize some $500 or $600 from it.

*William Moser* was a dealer in furs in New York when Paul J. George contracted this indebtedness to complainant.

Paul told witness at that time that he owned a nice house in Detroit, and a pair of horses, and some lands. Think he said he owned a good deal of land. He said he was doing well and making money. Witness sold him goods at this time which were not paid for.

*Magnus Frank* testified to similar statements having been made by Paul to complainant about the same time. Paul told complainant he was perfectly good—he was dealing in furs, and doing a good business.

*Simeon Dreyfous*, also a New York dealer, testified to similar statements made to himself about the same time. He also sold goods to Paul.

*George Miller*, called on behalf of defendants, testified that the said west half of lot 61 was occupied by defendants as a residence and homestead for many years, until about two years since. It was so occupied in 1851, '52, and '53. In 1851 it was worth somewhere from $1500 to $1700 or $1800: The property rose in value during the following year. Can not say how much.

The cause being brought to a hearing, the court decreed the conveyance to Train, and by him to Sally George, without consideration, except for the sum of $400; as to which amount it was directed to stand as security to said Sally in the nature of a mortgage, but fraudulent and void to every other purpose as to complainant. And decreed also that the conveyances to Zender, and by him to Sally George, were entirely fraudulent as to complainant, and his lien on the property.

From this decree, defendants appealed.

*C. I. Walker*, for complainant:

1. A voluntary conveyance, as against existing creditors, is fraudulent and void, without regard to actual fraudulent intent. The broadest qualification of this rule only protects such conveyances where the grantor is unembarrassed in his circumstances, and the conveyance is but of a small

portion of his property compared with his debts. — *Reade v. Livingston*, 3 *Johns. Ch.* 492; *Parkman v. Welch*, 19 *Pick.* 231; *Parish v. Murphree*, 13 *How.* 98.

2. Where it is made with actual fraudulent intent as to existing creditors, it is fraudulent and void as to subsequent creditors also. — 1 *Am. Lead. Cas.* 56; *Parish v. Murphree*, 13 *How.* 98.

3. If made for the purpose of defrauding subsequent creditors, or with reference to future indebtedness, then it is void as to such creditors. — *Sexton v. Wheaton*, 8 *Wheat.* 242; *Howe v. Ward*, 4 *Greenl.* 195; *Reed v. Reavis*, 7 *Ired.* 343; *Vertner v. Humphrey*, 14 *S. & M.* 143.

4. The fact that debts are contracted immediately after the conveyances, is sufficient evidence that the deed was made in reference to such debts. Ordinarily it is the only evidence to be had. — *Walker v. Burrows*, 1 *Atk.* 93; *Ridgeway v. Ogden*, 4 *Wash.* 139; *Thompson v. Dougherty*, 12 *S. & R.* 458. To make the conveyance actually fraudulent, it is not necessary that a party should deliberately entertain the corrupt intention to cheat. It is enough that he make a conveyance with reference to future indebtedness, and to guard against the hazards of business. — *Ibid.*; *Kirby v. Ingersoll*, *Harr. Ch.* 119.

5. Mrs. George can not claim as a homestead the lot conveyed to her. — *People v. Plumsted*, 2 *Mich.* 465. Her husband is estopped from claiming it by his own deed. It is only the *owner and occupant* that can make such claim. Creditors may hold his deed good for one purpose, and void for another. — *Wisner v. Farnham*, 2 *Mich.* 472; *Fox v. Willis*, 1 *Mich.* 321.

6. The only way in which the homestead exemption can be claimed is from the officer when the levy is made, or when it is first brought to the debtor's knowledge. — *Comp. L.* § 4497.

*W. P. Wells,* and *G. V. N. Lothrop,* for defendants:

1. A voluntary conveyance will not be set aside in favor of subsequent creditors unless there is clear proof of a fraudulent intent. — *Story Eq. Juris.* §§ 361, 362; *Reade v. Livingston,* 3 *Johns. Ch.* 497; *Sexton v. Wheaton,* 8 *Wheat.* 229; *Bennett v. Bedford Bank,* 11 *Mass.* 421; *Cosby v. Ross,* 3 *J. J. Marsh.* 290; *Benton v. Jones,* 8 *Conn.* 186.

2. Where subsequent creditors seek to set aside a settlement on the ground of indebtedness at the time, they must, in England, show an indebtedness large enough to amount to insolvency. — *Lush v. Wilkinson,* 5 *Ves.* 384; *Shears v. Rogers,* 3 *B. & Adol.* 362. The American cases do not go so far, but require that they should at least show that the person was largely indebted. — *Reade v. Livingston,* 3 *Johns. Ch.* 501; *Parkman v. Welch,* 19 *Pick.* 231; *Jones v. Slubey,* 5 *Har. & J.* 372; *Hudnal v. Wilder,* 4 *Mc Cord,* 294. An inconsiderable amount of indebtedness is not sufficient evidence of fraud. — *Howard v. Williams,* 1 *Bail.* 575; *McElwell v. Sutton,* 2 *Ibid.* 128. In case of a settlement upon a wife or child, if the debtor retain sufficient to pay his debts then existing, the settlement is not void, even though he does not pay such debts. — *Van Wyck v. Seward,* 6 *Paige,* 62. There must be sufficient evidence to establish the presumption of a secret trust in the grantor. — *Clark v. French,* 23 *Me.* 221.

Complainant fails to show any existing debt except that to John George. The presumption of fraud as to subsequent creditors, arising from this indebtedness, is repelled by the fact that it was secured by mortgages. — 1 *Am. Lead. Cas.* 72; *Wood v. Savage,* 2 *Doug. Mich.* 316.

3. Where an intent to defraud subsequent creditors is sought to be established, the conveyance. must appear to have been made with a view to subsequent indebtedness, and with an existing intention, in the mind of the grantor, to become afterwards indebted, *and to defraud.* A mere in-

tent to continue in business, in which debts would necessarily be incurred, can not be sufficient. There must be a *fraudulent* intent.

4. The Jefferson Avenue property is exempt from execution under the Homestead Law.

MARTIN Ch. J.:

The conveyances to Sally George were fraudulent and void, as against the complainant. That of the Hamtramck property was entirely without consideration, and appears to have been solicited by her, and procured for the support of herself and children, and under circumstances which, we think, show a purpose of keeping it from the reach of John George, then Paul J.'s creditor. That of the west half of lot 61, in Detroit, was alike voluntary, and, as is claimed, for the purpose of securing a homestead, except that a partial consideration—the sum of four hundred dollars—was paid by the wife ˙to the husband at the time of its execution. However laudable it may be ˙in the husband to make provision for the support of his wife and family—and it is certainly not merely laudable, but a duty, when it can honestly be done—yet the law will not suffer it at the expense of creditors, when its operation is fraudulent, or when the design to defraud them is apparent.

As far as we can ascertain the facts from the pleadings and proofs, at the time these conveyances were made by the defendants to Train and Zender, Paul was indebted to John George, his brother, in about the sum of one thousand seven hundred dollars, and a most bitter hostility existed between them—so great, that no communication or conversation passed; an intensity of hatred, between brothers, that warrants and impels us to the conclusion that the conveyances were made for the purpose of placing the property beyond his reach. The value of the property, at this time, appears to have been about equal to the amount of the debt, and although the defendants insist, in their answers,

that at that time Paul J. was not insolvent, and was indebted only to his brother, and to one or two others in small amounts, and had sufficient assets, open and visible, and within reach, to pay every creditor abundantly, without any reference to said real estate, yet this averment, although put in issue, was not substantiated by proof, nor was any offered to establish its truth. It was settled in this state, in *Beach v. White*, in accordance with the general rule of equity, that a deed which is fraudulent as to existing creditors, is fraudulent as to subsequent creditors.—See *Walk. Ch.* 496. To this rule there may be exceptions, as when the debt sought to be collected was contracted long after the fraudulent conveyance, or after the embarrassment which existed when it was executed had passed away, or a new embarrassment had occurred from subsequent causes, and the like; but the present case comes within none of the exceptions.

It is true that voluntary conveyances· are not necessarily fraudulent, even when made by a person indebted at the time. A man always has the right to dispose of his property as suits himself, provided he acts in good faith. But if he is largely indebted at the time, and such conveyance embraces the larger, or any considerable, portion of his property, such conveyance will be deemed fraudulent as to creditors. It is good when made without any fraudulent intent, and by a person not indebted at the time, or, if indebted, whose debts are so small in amount, when compared with the means still retained by him to pay them, as to repel all presumption of fraud on their account.— See *Beach v. White*, *Walk. Ch.* 496; *Cutter v. Griswold*, *Ibid.* 437.

In March, 1852, we find that a reconciliation took place between John and Paul George, and then deeds passed between them concerning the property in question, and John conveyed to Paul the lands which in August before he had conveyed to Train and Zender, from whom Sally George

derives her title. The deed from Train to her of the Hamtramck property was executed in August, 1851, and that from Zender in July, 1852. Shortly after this deed of July, 1852, we find Paul George expanding his business, and becoming suddenly and very heavily indebted to various houses in New York, and, among others, to this complainant, in some one thousand nine hundred dollars; and we find that at the time he contracted these debts, he represented himself to be the owner of the very property in question, for he could have referred to no other. This expansion of business was followed in less than six months by his mortgaging this very property, but without his wife joining, to John George, for the indebtedness which existed when the deeds to Train and Zender were executed, and which now amounted to one thousand seven hundred and eighty dollars, and by his making a general assignment of his property for the benefit of his creditors. His debts at this time amounted to nearly ten thousand dollars, besides that owing to John, and the nominal value of his assets to only about four thousand, while their real value turned out to be only about four hundred or five hundred dollars. These things are entirely unexplained, and taken in connection with the other facts of the case, manifest, beyond question, that Paul ,George meditated fraud, whether his wife was cognizant of it or not. Certainly if there is any case where a voluntary conveyance, and a cotemporary indebtedness of the grantor, make out a *prima facie* case for the creditor, this is that case; and it was the duty of the defendants, if they would prevent its becoming conclusive upon them, to have rebutted it by showing that the pecuniary circumstances of the grantor at the time were such as to repel the presumption of fraud.

The conveyance of the Hamtramck property can not, then, for a moment, be sustained. But it is thought that that of the west half of lot 61, in Detroit, stands upon a different footing. It seems that four hundred dollars of

money belonging to Sally George was given to Paul upon its execution; but it is not claimed that this was all, nor the material consideration which produced the conveyance to her. The real reason appears to have been, as now claimed in the answers, to secure it as a homestead. So far as relates to the four hundred dollars, the property is shown to have been worth at the time some one thousand five hundred to one thousand eight hundred dollars. This inadequate consideration, under the circumstances, will not sustain the deed as against creditors, although it will sustain it for her protection, so far as to secure to her the re-payment of that sum. The reason, or rather the pretence, that the property was conveyed to the wife to secure a homestead, can be of little value to determine the object of these conveyances to be *bona fide*, when we find that, as a part of the same transaction, although consummated at a different time, the Hamtramck property was conveyed without consideration and without explanation, and that, immediately subsequent, this sudden expansion of his business occurred, which as suddenly and disastrously collapsed. Why should this attempt to secure this Detroit property as a homestead be first made at the particular juncture of Paul's quarrel with John, and be consummated just before this expansion of his business, and the contracting of these debts?

But if the reasons be true, the claim of the property as a homestead, secured by this conveyance, can not avail these defendants. The law was never intended to be executed by parties in this manner. A homestead not to exceed forty acres, or a city or village lot not to exceed in value one thousand five hundred dollars, is exempt from execution; but such exemption must be claimed, and this value ascertained, at the time of the levy, or at least after it, and before sale. To hold that such exemption can be claimed at any other time, or in any other manner, than such as is contemplated by the statute, would open the door to the most monstrous frauds. If the claim can be made months

and years before a levy, and if the value at the time of the claim is to determine its value at the time of the levy, thousands of dollars may thereby, through rise in value, and the squandering of money in improvements and ornaments, be sealed up beyond the reach of creditors. The law never intended such a result.

But a homestead can not be secured by alienation of the property. No one but the debtor can claim it,—his grantee can not. If it was her property, it was not liable to be taken on execution for his debts; if it was not, her pretended title can be of no avail to him for the purposes of exemption. As owner, she can not claim it to be under the Exemption Act, against his debts—having conveyed it, the title is good as between him and her, although void as to creditors; and he can not claim it as exempt, for no title remains in him upon which to base such a claim.—See *Wisner v. Farnham*, 2 *Mich.* 472.

The decree of the court below must be affirmed, with costs.

MANNING J. concurred.

CHRISTIANCY J.:

·I concur entirely with my brethren in the opinion given by them in this case, so far as relates to the land situate in Hamtramck; and I concur in the result, but not in all the reasoning, in reference to the dwelling house and half lot in Detroit. I place my concurrence in the result, as to this house and lot, entirely upon the ground that, as shown by the evidence, the value of the property exceeded fifteen hundred dollars, the limitation fixed for a homestead.

From so much of the opinion of my brethren as implies the necessity of any particular mode of selecting, or ascertaining the value of a homestead, when it consists of a dwelling house and a single separate lot in a city or village, I entirely dissent; nor can I concur in the opinion that, in

such case, it can only be claimed when, or after, it has been levied upon by execution. But in my view of this case, these questions are not before us, and I reserve. the expression of any opinion upon them till a case arises which may render it necessary.

. CAMPBELL J. did not sit, having been of counsel.

*Decree affirmed.*