## HARTNETT v. DOYLE et al.

Middle Section.   December 23, 1932.

Petition for Certiorari denied by Supreme Court, March 18, 1933.

Richard S. West, of Nashville, for appellants.
Hume & Armistead, of Nashville, for appellee.

CROWNOVER, J.   This was a suit on account against the Doyles and their wives, as partners doing business under style of W. P. Doyle & Co., in which it was charged that partnership assets were used to purchase property the title to which was fraudulently taken in the individual names of the wives.

The original bill was filed on October 18, 1930, against W. P. Doyle and wife, Margaret Doyle, C. L. Ridley, Jr., and wife, Adele M. Ridley, residents of Davidson county, and John Doyle and wife, Rosa Doyle, then nonresidents of Tennessee, in which it was alleged that W. P. and John Doyle were brothers, engaged in the real estate and insurance brokerage business under the name of W. P. Doyle & Co.; that their wives, Rose and Margaret Doyle, were members of the firm, a partnership; that the partnership had been buying many houses and lots and much real estate with partnership funds, but had taken the title to same in the names of Rose and Margaret Doyle; that all four derived financial benefit therefrom; that Rose and Margaret Doyle had purchased a parcel of real estate at 905 Fourth Avenue South; that the said Ridleys were included for the purpose of ascertaining whether the consideration had been paid; that the property belonged to the partnership, though ostensibly owned by Rose and Margaret Doyle; and that W. P. Doyle & Co. owed complainant the sum of $2,600 on two accounts due him for fire insurance broked through W. P. Doyle & Co.   Complainant prayed that he recover of defendants the sum of $2,600 plus interest; that an attachment be levied on the right, title, and interest of Rose and John Doyle; and for general relief.

The attachment was issued on October 18, 1930.

On October 14, 1931, an amended bill was filed, wherein it was alleged that by canceling policies on which premiums had not been paid, the original claim had been reduced to $745.98, after allowing defendants' commission; that at defendants' request relations had been renewed and another account had been accumulated; that W. P. Doyle & Co. had become incorporated and a large part of the partnership assets had been conveyed to the corporation; that Rose and Margaret Doyle have been transferring real estate vested in their names to Anna Mathis Doyle, daughter of John and Rose Doyle; that partnership proceeds were being used to purchase real estate, which

was being taken in the names of Rose and Margaret Doyle; that No. 321 Seventh Avenue North had been purchased thus; that it had been rented to the city of Nashville for the use of the juvenile court, at a monthly rental of $250; that this lease had about a year to run; that the city of Nashville, a municipal corporation, chartered under the laws of Tennessee, has been made a defendant; that John and Rose Doyle have moved back to Tennessee, and that unless defendants are enjoined, they will take all the partnership money and dispose of it, it being charged that it was their purpose to defeat complainant's claim by fraudulent transactions. Complainant prayed an injunction against defendants and prayed that the bill be dismissed as to the defendants Ridley, since they had paid in full.

An injunction was issued under the amended bill, on October 14, 1931.

The defendants answered on November 2, 1931, and denied that Rose and Margaret Doyle were members of the partnership, that they had ever held themselves out as such, or that their property had been purchased with partnership funds. They alleged that the property in question had been purchased in September, 1928, by Rose and Margaret Doyle and by one Brugh, and that the cash payment for this particular tract came from a loan from a certain Phil Mayers; that the deal had only been closed through the office of W. P. Doyle & Co., just as other purchases had been made; that Rose and Margaret Doyle had been investing their own money in their own names in real estate for twenty-five years; that a great part of their original investment had come from their mother's estate; that they had never employed partnership assets, but had in all their deals borrowed capital from the banks in their individual capacity; that "it is true that a large portion of the rents of the property owned by defendants Rose and Margaret Doyle were collected by said partnership, but separate record was kept of same and accounted for just the same as other customers of the partnership, and (that) in fact their books showed that at all times defendants Rose and Margaret Doyle had a balance due them on the credit side of the ledger. Defendants, Rose and Margaret Doyle, offered to show that complainant knew, of his own personal knowledge, that they owned unincumbered real estate valued at over $30,000, that the same is now (was), and had been for years, subject to the satisfaction of any indebtedness they may justly owe." They further stated that no suit had ever been instituted or judgment rendered against them; that the tax books showed $100,000 assessed and $30,000 unincumbered; that Rose and Margaret had always filed separate income tax returns; that W. P. and John Doyle had always filed the report of the partnership; that Rose Doyle was never a nonresident and had always lived at No. 1107 Caruthers avenue, Nashville, Tennessee; that complainant had

sworn falsely to obtain the attachment; that no conveyance had been made to the corporation; that unincumbered property had been conveyed to Anna Mathis Doyle, and that they owned $30,000 worth of unincumbered property, and other pieces which were incumbered; that the rental income on their property amounted to about $1,500 a month; that no property had been placed in their names to evade creditors; that the property had been taken in their joint names for convenience, since they owned it jointly; that it had never been carried on the partnership books as partnership assets; that W. P. Doyle & Co. had no interest in the rent from the city of Nashville save for the collection of it on behalf of their clients, Rose and Margaret Doyle; that John Doyle was not and never had been a nonresident of Tennessee, and that he and his wife had lived and still were living at No. 1107 Caruthers avenue, Nashville, Tennessee; that he had been in bad health and had been unable to attend to his business; that he had sold his one-half interest to his brother Ed. C. Doyle, that he had parted with it before the indebtedness accrued, and that he had stated this personally to complainant; that complainant had asked to renew business relations, and the partnership had done so solely upon his urgent request; that complainant had tried to destroy their business after filing the original bill, by sending out notices telling defendant's clients not to pay their premiums and canceling certain policies; that W. P. Doyle denied the indebtedness, since he did not believe himself indebted. Defendants prayed the dismissal of the attachment and dissolution of the injunction and for a reference to the master for an accounting between complainant and defendants. No plea in abatement was filed.

On November 13, 1931, the court overruled the motion to dissolve the injunction and to dismiss the attachment.

The chancellor held that the complainant was entitled to the relief prayed for, and granted a decree for $1,765.95 and costs, against the defendants, and directed the city of Nashville to pay to the clerk and master all rents due the defendants from October 19, 1931, to June 7, 1932, from which decree defendants appealed to this court and assigned four errors:

(1) The chancellor erred in overruling appellants Rose and Margaret Doyle's motion to dissolve the injunction granted complainant on bill and answer.

(2) The chancellor erred in holding that appellants were members of the firm of W. P. Doyle & Co., and as such entering decree against them in favor of complainant Hartnett.

· (3) The chancellor erred in holding that the real estate holdings of appellants were purchased out of the assets of W. P. Doyle & Co., and in decreeing that the rents due from the city on No. 321 Seventh

Avenue North property owned by appellants should be applied to the satisfaction of complainant's decree.

(4) The chancellor erred in decreeing that appellants Rose and Margaret Doyle were indebted to complainant in any sum.

John and W. P. Doyle married sisters, Rose and Margaret Staub, respectively. For sixteen or seventeen years prior to his marriage, John Doyle had been a race horse man, owning and racing horses, and following the race circuits. In 1911, he and his brother W. P. (Rooney) Doyle formed a partnership for the purpose of dealing in real estate and making collections, under the name of W. P. Doyle & Co. In 1919, they added, as a side line to their other activities, the broking of fire insurance. They procured insurance and negotiated between insurers and insured. They formed a connection with Brugh, Hartnett Company, whereby they contracted with H. H. Hartnett to issue policies of insurance which they procured. About 1923, Frank Hostettler entered the partnership and the firm began the writing of insurance, having severed their connection with Hartnett. In 1926, Hostettler severed his connection with the partnership, and on April 12, 1926, a second connection was made with Hartnett; this was the contract under which the present action was brought. Frank Hostettler owed the Doyles some money when he left the firm, as well as rent to their wives. A house and lot was turned over to the Mesdames Doyle and a note for $1,400 was given in settlement. In the latter part of 1929, John Doyle's health became so poor that he had to leave the office entirely. Taking his family along, he began to follow the races again, attempting to improve his declining health by means of travel. In June, 1930, he sold his interest in the firm to his brother Ed. C. Doyle, submitting a written contract of sale on June 12 or 13, 1930. Ed. Doyle assumed a gross liability of $14,000. John Doyle continued to follow the races, being too sick to work, and spent the greater part of his time in Louisville, Ky. In October, 1930, W. P. Doyle & Co. became incorporated.

W. P. Doyle & Co. (the partnership) did an extensive rental and collection business. Rooney Doyle did the collecting for the firm and John Doyle was general manager, spending the greater part of his time at the office. They commenced as a collection agency and gradually added the other branches which now comprise the business. At the outset they employed their brother Ed., a deputy sheriff and notary public, to serve papers for them. Later they employed him as a clerk in their office, a position which he held for about fifteen years. During his employment Ed. Doyle never kept books and was not consulted in regard to the transactions of the firm.

When John Doyle married Rose Staub, she had about $500 in money, which she had saved in the course of years prior to her marriage. In 1909, the mother of Rose and Margaret Staub died, and

each inherited approximately $500. Margaret derived another $500 from the estate, it repaying an indebtedness due her.

John Doyle did not own any real estate, and never has held any in his own name. Rose Doyle bought a piece of property for $1,050 from Robert and Dora Lyle, and furnished the money herself. Then she borrowed $1,500 from Thos. W. Wrenne & Co., bankers, to build a house on it. She gave a mortgage and sold an one-half interest therein to her sister Margaret for $1,000. The original deed was from "Rose Doyle and husband, John, to Margaret." These notes were paid in 1910, before they were due, $500 of the $1,500 paid in coming from Rose Doyle's interest from her mother's estate. Rose and Margaret bought another small lot from Leo J. Burns for $165 cash. This was done prior to the commencement of the partnership by the brothers. The sisters made several small deals before the formation of the partnership. When that event occurred, Rose and Margaret owned two pieces of property, No. 1015 Summitt avenue, renting for $1.50 per week, and No. 1806 Lillian avenue, renting for $12.50 per month. This was the total of their investments and it amounted to little over $3,500. From this time on, their investments were greatly increased until they owned over sixty pieces of property in 1930, and the monetary value of their holdings rose from $3,500 to $125,000.

After the formation of the partnership, Mrs. Margaret Doyle started to work in the office, and acted as general foreman thereof. Mrs. Rose Doyle did not stay at the office, but remained at home.

W. P. Doyle & Co. began to manage the affairs of the Mesdames Doyle immediately upon its formation. The Messrs. Doyle gave each of them a separate account in their ledgers. The firm collected the rent on their property and credited itself with their usual five per cent. commission. They did not have an expert accountant, but did their own bookkeeping. They kept their records as nearly accurate as possible from the beginning, even though all members of the firm kept the books and the place of business of the firm was moved seven or eight times. They did not, however, keep their books so that they could tell the amount they owed their wives. They never made a settlement with their wives and were never called upon to do so. All checks for any purchases of either realty or personalty were drawn by W. P. Doyle for W. P. Doyle & Co. Personal bills of all four Doyles were paid either by check or "they just reached in the drawer and took it out." No memorandum was put in the drawer to account, but Mrs. Margaret Doyle would usually make an entry in the ledger.

No rent was collected from the property on No. 1806 Lillian avenue for eight years because the family lived there during that period,

and did not rent it. Afterwards John and Rose Doyle moved to 1107 Caruthers and lived there about twelve years.

Doyle & Co. did a $160,000 a year collection business. They had a gross income of about $10,000 a year. Their overhead expense was around $4,000 or $5,000. Each of the Doyles had an expense or drawing account of approximately $300 a month. Whenever they paid out any funds for repairs on the property of the Mesdames Doyle, they kept a regular account of it, also.

Rose and Margaret Doyle's names never appeared on the license of the firm. The license for the real estate and the fire insurance was usually taken in the name of W. P. Doyle alone.

The firm owed Rose and Margaret Doyle $35,000 to $50,000, and executed a chattel mortgage on the furniture and fixtures of W. P. Doyle & Co. for $2,000 to Richard S. West, trustee, for the benefit of these two women.

The property owned at No. 321 Seventh Avenue North is of the value of approximately $14,000, and was purchased in 1928. It was financed by borrowing $2,500 from Phil J. Mayers and $3,000 from the Fourth & First National Bank, now the American National Bank. Title was taken in the names of Rose and Margaret Doyle, just as all the other property had been.

Anna Mathis Doyle, daughter of John Doyle, had been working for W. P. Doyle & Co. for about seven years at a nominal salary. Rose and Margaret Doyle in 1930 sold (but no consideration was paid) to Anna Mathis Doyle property worth approximately $30,000. All of this property was incumbered, and she assumed the incumbrances.

1. The chancellor did not err in overruling the motion to dissolve the injunction, and the first assignment must be overruled. The defendants were putting all of their property beyond the reach of complainant and their other creditors as quickly as they could, and it was proper for the chancellor to prevent its improper disposition.

"An injunction will be granted against debtors and their privies, in behalf of creditors, in the following cases: 1, To prevent the fraudulent transfer or removal of the debtor's property, whether in his hands, or in the hands of a mala fide purchaser, or of a trustee; 2, To prevent the waste, removal, or transfer, of property on which the complainant has a lien; 3, To prevent a multiplicity of suits, the cost of which will absorb the common fund.

"No injunction, however, will be granted on behalf of a mere general creditor, to prevent the debtor selling or encumbering his property, when no grounds therefor are alleged except the fact of indebtedness the insolvency of the defendant, and the fear that he may sell or encumber." Gibson's Suits in Chancery, section 806.

But in this instance they were disposing of their property and putting it beyond the reach of their creditors.

2. The chancellor probably erred in holding that appellants Rose and Margaret Doyle were members of the partnership, but this was harmless error since it will not affect the result. Rose and Margaret Doyle conducted themselves in such a way that it was natural to suppose that they were members of the partnership, even though they themselves had no intention of being members thereof or of holding themselves out as such. Rose and Margaret Doyle were patrons, rather than partners, though this is a border-line situation. Whether or not they are held dormant partners will not affect the final result, as we think they used the assets of the firm to pay for the property they purchased. When property has been fraudulently conveyed, the creditor may recover its value from the grantee who joined in the fraudulent conveyance. Solinsky v. Lincoln Savings Bank, 85 Tenn., 372, 4 S. W., 836; Bank v. Haller, 101 Tenn., 85, 52 S. W., 807; Colonial Milling Co. v. Holt Brothers, 3 Tenn. App., 621; Fraudulent Conveyance Act 1919, chapter 125, sections 9 and 11.

3. The third and fourth assignments of errors are not well made. The chancellor did not err in holding that the real estate holdings of appellants were purchased out of the proceeds of the assets of W. P. Doyle & Co., and in decreeing that the rents due from the city of Nashville on No. 321 Seventh Avenue North, property owned by appellants, should be applied to the satisfaction of complainant's decree; and he did not err in decreeing that appellants Rose and Margaret Doyle were liable to complainant.

The appellants insist that the conveyances were not fraudulent conveyances in fact, and that there is no proof that the partnership was indebted or insolvent at the time the appellants acquired this property; therefore they insist that the partnership had a right to make even a voluntary conveyance if it owed no debts, and the conveyances would not be fraudulent as to future debts. This would be true unless the record shows that the conveyances were made in anticipation of future debts or for the purpose of defrauding future creditors.

We must deal here with a case of fraud. "Fraud assumes such protean shapes, is so detested by the law, and can be approached from so many angles, that courts refuse to define it, or fix hard and fast limits to it. It is not strange, therefore, that they have not always been able to hold a uniform and steady voice in applying the same set of principles to every case. . . . No man should be allowed to build a superstructure of rights on a foundation of actual fraud, for fraud vitiates everything." Cole v. Cole, 231 Mo. 236, 132 S. W., 734, 742.

As a general proposition, "a wife may freely contract with her

husband. That, if she be a bona fide creditor, her debt stands on as sure a foot as that of any one else, he may prefer her, since those acts, as before, by securing her debts to the exclusion of others, existing or subsequent, notwithstanding she may have known of his indebtedness and insolvency, notwithstanding she knew that the fact of her preference would have the ultimate effect of hindering and delaying his other creditors, and notwithstanding the husband intended to hinder and delay his creditors; all this, so long as (and provided always) she keep her hands clean by not participating in and becoming a party to his fraudulent intent. There is thin ice there, and one who walks thereon has need of great care. . . . A preference of a wife by an insolvent debtor, which hinders and delays other creditors will be closely scrutinized, for the marital relation affords a convenient cover for fraudulent transfers. . . . If a wife be a bona fide creditor, of her husband, the debt to her stands on as sure a footing as that to any one else, and he may prefer her, and although such preference will hinder and delay other creditors, it is valid, providing the wife is not a party to the fraudulent intent of the husband. . . . Where a transfer of property by a husband to his wife is attacked by creditors as fraudulent, and the parties claim that it is in payment of a just debt, the court 'will look for corroborative proof, or, failing that, for those badges of good faith arising from specification in details, date, amount, etc., of the debt. . . .'' Cole v. Cole, supra.

''Fraud is easy to accomplish and hard to prove. It is a sound proposition that, as the marital relation affords a convenient cover for fraudulent property transactions between husband and wife, courts, where fraud is charged as the gist of the action, will closely eye such transactions (when in conflict with the claims of creditors) to see they do not hide and consummate fraud, being always mindful, withal, that judicial zeal to uncover and smite fraud must not be pushed so far as to dam up a natural and proper flow of marital affection, or whittle away the duty of a husband to be just to his wife. To her (as to others), he should live honestly, should hurt nobody, and render to every one their due, thereby observing the great commandment of the law. . . .

''Where an honest conveyance is made to pay a debt, there is generally a correspondence in value between the property and the debt, and an excess in value of the property over the amount of the debt is a badge of fraud. . . .

''In addressing itself to the question, 'What then are the circumstances which would justify a court in holding a conveyance fraudulent as to subsequent creditors?' it was said: '. . . A design or purpose to hinder, delay, or defraud those to whom he is about to become indebted, are some of the marked indicia of fraud. In a

word, an intent to contract debts and a design to avoid the payment of such debts by the conveyance.' . . .

"Intent to defraud may be deduced from circumstances tending to prove such intent. In the nature of things, it is not susceptible of direct proof. There is evidence not only showing that her mind cooperated with his in concocting the original fraud to hinder and delay existing creditors, but there is satisfactory, inferential evidence showing the fraud was intended as a continuing one against subsequent creditors. What was done certainly had that effect, and the natural effect of that act is presumed to have been intended. If, therefore, it was necessary, on top of actual fraud intended to existing creditors to show an intent to hinder and delay subsequent creditors, the case is not without evidence to sustain the latter. . . .

"A conveyance by which the grantor puts all property subject to legal process out of his hands, with intent to hinder and delay his existing creditors, is fraudulent as to them. . . .

"Where property is conveyed by a husband to his wife, with the intent on the part of both that he shall continue in business, and that the conveyance shall screen the property from any debts that he may incur, it is void as to his subsequent creditors." Cole v. Cole, supra. See Noel & Co. v. Hendrixson,[1] DeKalb Equity, opinion of this court rendered at Nashville on October 1, 1932.

"Fraud, it need scarcely be said, is never presumed, and must be proved. It is true, it does not require positive and direct proof to establish it. It may be implied from circumstances. In fact, circumstances may be more conclusive and satisfactory than positive expressions of opinion." Tarbox v. Tonder, 1 Tenn. Ch., 163; Noel & Co. v. Hendrixson, supra.

"Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud." 26 C. J., 1061; Bank of Blount County v. Dunn, 10 Tenn. App., 101; Noel & Co. v. Hendrixson, supra.

It has been well said in one of our Supreme Court cases that: "Creditors have a right to expect that their debtor will deal fairly and in good faith with them; and if, upon the eve of an indebtedness about to be increased, and with a view thereto, and without the knowledge of the party extending the credit, the debtor makes a voluntary conveyance of property, upon which he knows his contem-

---

[1] Unreported. Writ of certiorari not filed.

plated creditor relies or has a right to rely, this is an actual fraud, producing the same results both upon existing and subsequent creditors; and such conveyance is not relieved from its fraudulent character from the fact that it has been registered, if the creditor has no actual notice, and the conveyance, without his negligence, operates as a surprise upon him." Churchill v. Wells, 7 Cold. (47 Tenn.), 364.

The Tennessee statutes are very plain on this subject.

"Every gift, grant, conveyance of lands, tenements, hereditaments, goods, or chattels, or of any rent, common or profit out of the same, by writing or otherwise; and every bond, suit, judgment, or execution, had or made and contrived, of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures; or to defraud or to deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be deemed and taken, only as against the person, his heirs, successors, executors, administrators, and assigns, whose debts, suits, demands, estates, or interests, by such guileful and covinous practices as aforesaid, shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, of any other matter or thing, to the contrary notwithstanding." Code, section 7832.

"Land purchased and paid for by the husband who, for the purpose of defeating his creditors, fraudulently procures the same to be conveyed to his wife, will be subjected to the payment of his debts, upon a bill filed for that purpose. Yost v. Hudiburg, 2 Lea, 627, 628, 632. See Dillard v. Dillard, 3 Humph., 41, 46, 47; notes 96 and 224; notes on Resulting Trusts, sec. 3679." Shannon's Code, section 3143, note 36.

"The following facts are either badges of fraud or circumstances which awaken suspicion.—. . .

"(o) Embarrassment, relationship, no money paid, nominal ownership changed by deeds and forms of law, possession and real ownership continuing as before. Grannis v. Smith, 3 Humph., 181.

"(p) All the badges of fraud usually mentioned in the cases arising under the statute, and found to exist in this case, are as follows: A vendor indebted to insolvency; all his property conveyed; retaining possession as before; the price not a full one, but inadequate; the vendees near relations to the vendor; the price stipulated not paid down, but a long credit given, although the ostensible motive of the sale was to place the vendor in possession of funds to pay his debts; the conveyance made to three persons jointly of property not convenient to be held and enjoyed in that mode, and which they pretended to rent and hire to the insolvent vendor and debtor. Tubb v.

Williams, 7 Humph., 367, 369, 370.'' Shannon's Code, section 3143, note 220.

The case of Nicholas v. Ward, 1 Head (38 Tenn.), 323, 73 Am. Dec., 177, states:

''A voluntary conveyance to a child or relative, or even to a stranger, is good, if it be not, at the time, prejudicial to the rights of any other person, or in execution of any mediated scheme of future fraud or injury to other persons. Although the party may not have been indebted at the time of making the voluntary gift or conveyance, still, if it was made with any design of fraud or collusion, or injury to other persons in future, it will be void.

''If the conveyance is made with the intention to defraud existing creditors, it will, in general, be held void as to subsequent creditors. But if there be no existing creditors, and if the conveyance is made bona fide, and under circumstances which repel any presumption of fraud, subsequent creditors cannot impeach it although it is voluntary.''

''Where a person, whether indebted or not, makes a conveyance, either upon a valuable consideration or voluntary, with the express and actual intent of defrauding future creditors, it is, of course, fraudulent and void as against such future creditors. For this reason, if a person, in contemplation of a future indebtedness which he expects to accrue, makes a conveyance for the purpose of placing his property beyond the liability for such anticipated indebtedness, the transfer is fraudulent as against the future creditor when his claim arises. . . . If a person, not at the time indebted, being about to engage in a new and hazardous business, makes a voluntary settlement or conveyance, whereby he places his property or a considerable portion of it beyond the reach of his creditors, such settlement or conveyance is fraudulent and void as against the subsequent creditors of the grantor. Finally, it may be laid down as a doctrine generally accepted, that if a person, being at the time indebted, makes a voluntary conveyance of his property to such an extent that he is left actually insolvent, or wholly unable to pay his existing debts, or that it is reasonable to suppose he contemplated his consequent inability to pay, or even that it is reasonably doubtful whether he is able to meet his obligations, then the conveyance will be fraudulent and void as against his subsequent as well as his existing creditors. The inference of a fraudulent intent must always depend upon there being an amount of property remaining after the voluntary conveyance, reasonably sufficient to defray all of the grantor's existing liabilities; and each case must therefore stand upon its own particular circumstances.'' 2 Pomeroy's Equity Jurisprudence (3 Ed.), 1801, section 973.

''The following seems to be the true rule: ''If the amount of prop-

erty after the voluntary conveyance was so small in comparison with the existing indebtedness that the grantor could not reasonably have contemplated his ability to perform his obligations, or in other words, he could reasonably have contemplated his inability to perform them, then an intent to defeat his creditors generally will be inferred, and the conveyance will be fraudulent against subsequent as well as existing creditors.'' 2 Pomeroy's Equity Jurisprudence (3 Ed.), 1798, section 971.

''A person who was considerably indebted, caused his real estate to be conveyed to his wife, and soon afterward contracted large debts, representing himself to be still the owner of the real estate. He failed within a few months thereafter, and made an assignment showing assets to be less than half the amount of his debts, and there was no explanation of these facts. It was held that the settlement upon the wife was fraudulent and void as to subsequent creditors. Herschfeldt v. George, 6 Mich., 456.

''Where an insolvent husband voluntarily conveys his property to his wife to save it, and then according to a preconceived plan borrows money to pay off existing indebtedness, knowing that he will probably be unable to repay it, the creditors loaning the money have the same right to attack such conveyance as prior creditors would have had. Lane v. Newton, 140 Ga., 415, 78 S. E., 1082.'' 27 C. J., 522, note 11 (a).

''A conveyance or transfer, whether founded on a valuable and adequate consideration or not, if entered into by the parties thereto with the intent to hinder, delay, or defraud creditors, is void as to them. It is not enough, in order to support a conveyance or transfer as against creditors, that it be made for a valuable consideration; it must be also bona fide. The fact of the payment of a valuable consideration on a transfer of property is not, as a proposition of law, inconsistent with the existence of an intent to defraud, but is simply a circumstance to be considered in determining the question, of fraudulent intent. The law will not permit one man to assist in cheating another, and when it appears that the parties to a transaction impugned for fraud were actuated by a motive which the statute denounces as fraudulent, to wit, to hinder, delay or defraud creditors, it is utterly immaterial how valuable a consideration may have passed from the grantee or transferee for the conveyance is none the less void in law. But as has been seen a mere fraudulent intent on the part of the grantor will not invalidate a conveyance or transfer which is accepted by the grantee in good faith and for a valuable consideration.'' 27 C. J., 519, section 197.

''Where a conveyance is made with the intent to defraud subsequent creditors it may be assailed for fraud and set aside by them; and the rule is of course applicable where the conveyance is volun-

tary. However, it must be made to appear either by positive evidence or by facts which justify the inference that the conveyance was executed with an actual fraudulent intent on the part of the grantor to defraud creditors, where there was none at the time the conveyance was made.'' 27 C. J., 521, section 198.

''Relationship of the parties to a conveyance is not, of itself, a badge of fraud; but a fact, which naturally awakens suspicion, and lends greater weight to other unfavorable circumstances, and renders necessary fuller and more distinct proof of the consideration and fairness of the transaction.'' Robinson v. Frankel, 85 Tenn., 475, 3 S. W., 652; Bank of Maryville v. Thornton (Tenn. Ch.), 35 S. W., 565; First National Bank of Centreville v. Wilkins, Tenn. App., 16; Noel & Co. v. Hendrixson, supra.

''The conveyance must be made with an intent to put the property out of the reach of debts which the grantor, at the time of the conveyance, intends to contract, and which he does not intend to pay, or has reasonable grounds to believe that he may not be able to pay. There need not be an intent to contract any particular debt or debts. It is sufficient if there is an intent to contract debts and a design to avoid the payment of such debts by the conveyance.'' Bump on Fraudulent Conveyances, 292; Nelson v. Vanden, 99 Tenn., 224, 42 S. W., 5; Noel & Co. v. Hendrixson, supra.

From a consideration of these cases it will be seen that we are here dealing with many fraudulent conveyances. Up until the time of the formation of the partnership, we are able to account for all of the money that the Doyles possessed and the distribution thereof. From the moment of the formation onward until this suit was instituted, their profits and incomes are not shown. They say they had much success, while the Doyle & Co. partnership, a business on a much larger scale, declined from bad to worse. The statements of the transactions, the purchases and sales, made by the wives explain nothing, as the books were not filed in evidence, and the proceeds of sales were not traced into the purchases of other property. Evidently the books were not well kept, as defendant John Doyle could not testify with any degree of certainty as to the amount of the account between W. P. Doyle & Co. and the wives. He thought the company owed the wives between $35,000 and $50,000. The analysis of his statements of the wives' transactions is:

Money inherited by the wives, invested .............. $  3,050.00
Proceeds of property sold since 1910 ................. $ 80,451.00
Money borrowed from banks ....................... $ 40,585.00

Total          $124,086.00

Total cost of real estate purchased by Rose and Margaret
    Doyle ......................................... $124,086.00

His statements show net revenue reported to United States government from 1922 to 1930, $37,341.92. They hold property unincumbered valued at $24,000, and have conveyed to Anna Mathis Doyle property valued at $28,500. These statements explain nothing. According to these statements they held their own in buying and selling, to the dollar, which is remarkable; but it does not show what income they derived from the property while they held it.

We are of the opinion that the Doyles used the partnership funds to purchase property for their wives, and placed the title to the property in the names of their wives. This was done to create the impression that the property did not belong to W. P. Doyle & Co., and for the purpose of defrauding, hindering, and delaying creditors. It is well to quote the chancellor in part:

"Margaret and Rose Doyle were women of very small means in 1906 when their operations in real estate began. Between the dates of 1906 and 1929 these two women handled more than sixty pieces of real estate valued at about $124,000. The real estate purchased by them before the firm of W. P. Doyle & Co. was organized in 1911, consisted of about four or five pieces of the value of $3740. Rose Doyle had about $1000 of her own fund and inherited from her mother's estate about $500, while Margaret Doyle received from her mother's estate $1000 and borrowed from Barbara Staub another $500. This was the only capital these women had to handle this enormous amount of real estate in the period mentioned.

"It will be seen that each started out with about $1500 and in the course of twenty-three years handled $124,000 worth of real estate and now have real estate of the value of $24,000, free and unencumbered, and real estate encumbered with loans of approximately $40,000, while their husbands are insolvent and execution proof.

"As stated, the firm was organized in 1911 to engage in the real estate business and commenced to do a fire insurance business in 1919. In 1930 John Doyle claims to have sold his interest to his brother Ed., but states that after he left the firm he told complainant that he would be personally responsible and would see that all premiums collected by W. P. Doyle & Co. were paid to him. $892.44 of the amount sued for in this case is for premiums collected and not accounted for after John Doyle made this statement to complainant.

"The firm of W. P. Doyle & Co. had a gross average income of about $10,000 per year and each partner received about $300 per month net income from the business of the firm from 1915 to 1930. John Doyle testified that the firm owed Rose and Margaret Doyle $35,000 to $50,000, and although they executed a chattel mortgage on the furniture and fixtures of W. P. Doyle & Co. for $2,000 to Richard S. West, Trustee, for the benefit of these two women, it is not explained why only this small part of the large indebtedness is

secured by a chattel mortgage. Margaret Doyle was active in the office of W. P. Doyle & Co.

"The property owned at 321 Seventh Avenue, North, is of the value of approximately $14,000 and was purchased in 1928 and the title taken in the name of Rose and Margaret Doyle. It is claimed that they made the cash payment and borrowed the money to make the other payments and assumed the mortgage indebtedness on this property, and notwithstanding that the firm of W. P. Doyle & Co., composed of this husbands, dissolved in 1930, this property has continued in their names.

"It appears that the sisters-in-law are continuing their partnership after the partnership between their husbands has been dissolved. . . .

"The Court is of opinion that the facts of this case show that John and W. P. Doyle and their wives Rose and Margaret Doyle, having deliberately entered into an arrangement having the fraudulent purpose and object of defeating the creditors, present and future, of W. P. Doyle & Co., and that under this arrangement that these wives not only received a part but practically all of the profits of this business. It is simply unthinkable to any fair and candid mind that these two women on the meager sum of $1500 each, in twenty-three years, could accumulate this vast amount of property, while their husbands with a business of approximately $10,000 per year at the end of twenty-three years were grossly insolvent and judgment proof. No such thing occurred and the profits of this partnership are reflected in the profits that these women claim to have made."

We agree with the chancellor in his findings of fact.

4. These facts bring the case within the Uniform Fraudulent Conveyance Act, Pub. Acts of 1919, chapter 125, which provides:

"Sec. 4. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

"Sec. 5. Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business transaction without regard to his actual interest.

"Sec. 6. Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

"Sec. 7. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

"Sec. 8. Every conveyance of partnership property and every partnership obligation incurred when the partnership is or will be rendered insolvent, is fraudulent as to partnership creditors, if the conveyance is made or obligation is incurred (a) to a partner, whether with or without a promise by him to pay partnership debts, or (b) to a person not a partner without fair consideration to the partnership as distinguished from consideration to the individual partners."

5. It was the duty of the other defendants to testify. The evidence tended to fix liability on them; they had it in their power to offer evidence to rebut the unfavorable inferences, but failed to offer it. From this it could be inferred that the fully developed evidence would establish liability on their part. We are aware of the rule that: "A voluntary conveyance or settlement will be presumed fraudulent as against existing creditors. But, as to subsequent creditors, there is no such presumption, and fraud in fact must be established." Nicholas v. Ward, 1 Head (38 Tenn.), 324, 73 Am. Dec., 177. In Tennessee, the burden of proving fraud is on the creditor where the conveyance is made to the wife. Farmers' Bank of Lynchburg v. Farrar, 4 Tenn. App., 186. However, "no presumption of fact, will arise from the failure of the defendant to testify or to introduce witnesses where the plaintiff failed to make out his case, but where the evidence tends to fix liability on the defendant, and he has it in his power to offer evidence to rebut the unfavorable inferences, and fails to offer such proof, it may be inferred that the fully developed evidence would establish liability upon his part." Auburn Nashville Co. v. Graham, 13 Tenn. App., 444.

In a suit involving the trust assignment of property, it is not error for the court, after charging generally that, if the deed were made for the benefit of the grantor or to defraud creditors, it would be void, and enumerating the ordinary badges of fraud, to add that these badges might be rebutted by proving that the deed was made for a bona fide valuable consideration; for, although a deed designed to defeat creditors would be fraudulent and void even if a full price were paid, yet the meaning of the judge was that if the deed be proved to have been made in good faith for a valuable consideration, such evidence rebuts all inferences from the existence of facts usually considered badges of fraud. Trotter v. Watson, 6 Humph. (25 Tenn.), 509.

"The failure of a party to be examined as to matters necessarily within his personal knowledge, affords a presumption against him, where the proof is not clear, and the case he seeks to make, could be

proved by him, if true.'' Dunlap v. Haynes, 4 Heisk. (51 Tenn.), 476.

''On a bill to set aside a fraudulent conveyance, it being asserted in an answer not sworn to, that a certain payment was made, and there being proof in the case, that the party who was said to have made the payment, did not have the means to make it, it devolved on him to prove actual payment by satisfactory evidence.'' Dunlap v. Haynes, supra.

''Where a son, daughter and son-in-law reside with the father, and a conveyance is made to the son of the land on which they live, the father being insolvent, knowledge of the insolvency by the daughter and son-in-law will be inferred.'' Dunlap v. Haynes, supra.

If the evidence of the party attacking a deed for fraud make out a prima facie case, or place the deed under great suspicion of fraud, it is incumbent on the claimant, under the deed, to prove, at least, that he had actually paid for the property. Farnsworth v. Bell, 5 Sneed (37 Tenn.), 531.

''Conveyances made upon a valuable consideration are not presumed to be fraudulent against existing creditors, and the extent of the grantor's indebtedness is wholly immaterial. Conveyances upon a valuable and even full consideration are void against existing and subsequent creditors, if made with an actual express intent to hinder, delay, or defraud them; but the intent cannot be inferred by presumptions, and must be proved by evidence legitimately tending to show its existence.'' 2 Pomeroy's Equity Jurisprudence (3 Ed.), 1799, section 972.

''Suspicious circumstances creating a suspicion or presumption of fraud must be rebutted by the defendant claiming under a conveyance.—The burden of proof rests upon the complainant alleging that a conveyance was made to defraud creditors to establish the fraud, where the fraud does not otherwise appear in the admissions or circumstances; but where the facts and circumstances established by the pleadings and the proof raise a suspicion of fraud which is equivalent to a presumption of fraud, it is incumbent upon the party, though a defendant, claiming under the conveyance, to remove such presumption and to show the good faith and fairness of the transaction, and the actual payment of the consideration.'' Shannon's Code, section 3143, note 226 and cases there cited.

6. ''Inference of fraud may be drawn from facts and circumstances admitted in answer, and the burden of proof put on defendant, though the answer explicitly denies the fraud.—Where the answer to a bill attacking a conveyance of property as fraudulent against creditors not only denies the fraud as charged, but goes further, and gives the details or history of the transaction, and states and admits the embarrassment, relationship, sale on long credit,

nominal ownership changed by deeds and forms of law, while the possession and real ownership continued as before, any legitimate in-inference may be drawn therefrom, even though it be to establish the existence of fraud in the face of the general denials of the answer, and to cast the burden of proof upon the defendant; for fraud is deducible from the facts and circumstances admitted in the answer though the fraud is explicitly denied. Grannis v. Smith, 3 Humph., 179, 181; Yost v. Hudiburg, 2 Lea, 627, 629, 630, 631; Rhodes v. Wood, 9 Pickle [93 Tenn.], 705-707 [28 S. W., 294].'' Shannon's Code, section 3143, note 229; Farmers' Bank of Lynchburg v. Farrar, 4 Tenn. App., 186.

''Answer evasively denying the fraud charged in the bill casts the burden on the defendant.—Where a preexisting creditor files a bill to set aside the debtor's voluntary conveyance of land to his wife, alleging that the land conveyed was all the property the debtor then possessed, the answer stating that the debtor 'was then in good circumstances, with means enough and more than enough to pay all his debts,' is not responsive but is evasive as to the charge that the debtor possessed no other property. Such statement in the answer is, at most, the statement of a legal conclusion which the defendant is not permitted to draw for himself, or the expression of an opinion without giving any fact to justify it; and such answer does not, therefore, deny the charge in the bill, either directly or by a statement of facts which negatives it. Welcker v. Price, 2 Lea, 666, 667, 668.'' Shannon's Code, section 3143, note 230.

It results therefore that the decree of the chancellor holding that Rose and Margaret Doyle and their husbands, John and W. P. Doyle, made and accepted fraudulent conveyances for the purpose of hindering, delaying, and defrauding their creditors, especially the complainant, and that they were liable to him in the sum of $745.98 with interest from October 18, 1930, and the further sum of $892.44 with interest thereon from July 1, 1931, is affirmed. The first, third, and fourth assignments of errors are overruled, and a decree will be entered in this court for $1,638.42 and interest thereon, as hereinabove stated, against John and W. P. Doyle, their wives, Rose and Margaret Doyle, and the sureties on their appeal bond, in favor of H. H. Hartnett. The cost of the cause including the cost of the appeal is decreed against the appellants and the sureties on their appeal bond.

Faw, P. J., and DeWitt, J., concur.