255 F.2d 759
 The FIRST NATIONAL BANK OF CHICAGO, Trustee of a Trust Created by Marva Trotter Barrow by an Agreement Dated November 21, 1947, and Known on the Records of the Trustee as Trust No. 36358, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
The FIRST NATIONAL BANK OF CHICAGO, Trustee of a Trust Created by Marva Trotter Barrow by an Agreement Dated July 7, 1949, and Known on the Records of the Trustee as Trust No. 38328, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
Marva Trotter Barrow SPAULDING, Respondent.
 No. 12115-12117.
 United States Court of Appeals Seventh Circuit.
 May 22, 1958.
 
 George B. Christensen, Arthur J. Wilson, Frank B. Gilmer, Crane C. Hauser, Chicago, Ill., for petitioner First National Bank and others. Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.
 Charles K. Rice, Asst. Atty. Gen., Melvin L. Lebow, Atty., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., for Commissioner of Internal Revenue.
 Before DUFFY, Chief Judge, and FINNEGAN and HASTINGS, Circuit Judges.
 DUFFY, Chief Judge.
 
 
 1
 These are appeals from the Tax Court. Joseph Louis Barrow will hereinafter be referred to as Joe Louis or Louis. He is the former heavyweight boxing champion of the world. In 1935 he married Marva Trotter who will hereinafter be called Marva. A daughter Jacqueline was born in 1943. Marva and Joe were divorced in 1945 and were remarried in 1946. They were divorced a second time on February 15, 1949. During the second marriage a son Joe, Jr. was born.
 
 
 2
 Joe Louis served in the United States army from 1942 until October 1, 1945. Marva filed her suit for divorce early in 1945. Joe informed Marva he was not financially able to make a substantial property settlement with her. At the time Joe Louis was discharged from the army, he had no substantial assets except the heavy weight championship, and had liabilities exceeding $240,000.00.
 
 
 3
 On the day before the first divorce decree was entered, and in contemplation thereof, Joe and Marva entered into two written agreements hereinafter called the "settlement agreement" and the "manager's agreement". The manager's agreement was physically attached to and made a part of the "settlement agreement."
 
 
 4
 The Settlement Agreement provided in substance and so far as here material:
 
 
 5
 That, whereas the parties had agreed upon a settlement of all their marital rights and obligations, each of the parties accepted the provisions of such agreement in lieu of all dower rights; in lieu of all claims of each against the other for alimony, maintenance and support; and also in full satisfaction of other claims and demands of each against the other, except the obligations imposed by such agreement;
 
 
 6
 That Louis relinquished to Marva all his right, title and interest in the household furnishings and effects, other than his personal effects, and also in all bank accounts standing in Marva's name;
 
 
 7
 That Marva acknowledged that she had no right, title or interest whatsoever in any property held in the name of Louis; or in any property or money held in the name of any person, firm or corporation, as trustee for him;
 
 
 8
 That Marva would have the care and custody of their minor daughter Jacqueline, subject to certain consultation and visitation rights in Louis; and that Louis would pay her $200 per month for the child's support.
 
 
 9
 That, in lieu of any further provision for the maintenance, support and alimony of Marva, Louis would execute simultaneously with such Settlement Agreement, the Manager's Contract, * * * and
 
 
 10
 That Marva, in the event she were granted a decree of divorce in the pending divorce proceeding, would, in consideration of said covenants and agreements, agree:
 
 
 11
 "To create a trust fund in a suitable Chicago bank or Trust Company, to be mutually agreed upon, to be in the name of Joe Louis Barrow and Marva Trotter Barrow for the benefit of Jacqueline Barrow, the minor child of the parties hereto, and to pay into the said trust fund a sum equal to fifty per cent (50%) of all monies received by the said Marva Trotter Barrow growing out of the manager's contract, heretofore referred to and made a part hereof."
 
 
 12
 It was further mutually agreed that, if at any time during the term of such Manager's Contract there should be any breach or default by Marva in performing the above-mentioned provisions relating to the minor child, then such Manager's Contract could, at the option of Louis, be immediately revoked and terminated by him.
 
 
 13
 The Manager's Agreement provided in substance and so far as here material:
 
 
 14
 That Louis engaged Marva as his business manager, or co-manager, for a period of 5 years to commence when Louis received his discharge from the Army, but in any event not earlier than June 1, 1945;
 
 
 15
 That Marva agreed to exert herself for the profit, benefit and advantage of Louis, and to perform such duties as are generally required of a manager of a professional boxer;
 
 
 16
 That Marva understood that Louis was then indebted to the Government of the United States and to other named creditors in an aggregate amount which might exceed $200,000; and that no money should be deemed earned, due and owing to her under the Manager's Contract until after the aggregate amount of said indebtedness had first been deducted and paid from the moneys derived by Louis from professional boxing contests and other sources in connection therewith.
 
 
 17
 That Louis agreed to pay Marva 25 percent of all sums derived by him from any services rendered in professional boxing contracts during the term of the Manager's Contract, and from radio broadcasting, motion pictures, and television pictures in connection therewith; provided, however, that such percentage would be payable only after deduction from the proceeds of the foregoing of a sum sufficient to pay all the above-mentioned indebtedness of Louis to the extent of $200,000 and also after deduction of all expenses incurred by Louis in connection with any boxing contest in which he engaged during the term of such Manager's Contract;
 
 
 18
 That the Manager's Contract could not be sold or assigned without Louis' written consent;
 
 
 19
 That Marva would not be required to devote her entire time and attention in and about the business of Louis;
 
 
 20
 That Louis might, without cost or expense to Marva, engage a co-manager to render the same services which she was required to render under the Manager's Contract; and
 
 
 21
 That said Manager's Contract would, at all times, be subject to the terms of a prior existing agreement between Louis and one Michael S. Jacobs, under which the latter had exclusive promotional rights of all boxing interests in which Louis might engage.
 
 
 22
 On March 27, 1945, Louis and Marva were divorced by the Superior Court of Cook County, Illinois. The settlement agreement hereinbefore described was approved by the Court. Marva was given the custody of Jacqueline.
 
 
 23
 In June, 1946, Louis won a championship fight with Billy Conn. Shortly thereafter, he paid Marva $60,000.00 pursuant to the manager's contract. Marva deposited this sum in her personal account and thereafter placed one-half thereof in a separate account called the Jacqueline Barrow account. On November 21, 1947, an irrevocable trust for the benefit of Jacqueline was created with the First National Bank of Chicago as trustee, which in the Trustee's records was known as Trust No. 36358. Marva was described therein as the "donor", and she delivered to the Trustee the sum of Thirty Thousand ($30,000) Dollars as the initial corpus of the trust. This payment was made by check of the Drexal National Bank where she had previously deposited the Sixty Thousand ($60,000) Dollars received from Louis.
 
 
 24
 The preamble of the trust agreement read as follows:
 
 
 25
 "Under date of March 26, 1945, the Donor entered into a property settlement agreement with Joseph Louis Barrow, under the terms of which it was provided that she should establish a trust with a bank or trust company in Chicago, Illinois, of one-half (½) the net proceeds received by her under the manager's contract referred to in said agreement for the benefit of her daughter, Jacqueline Barrow. Said agreement was approved by the Superior Court of Cook County, and this trust is established in pursuance of that agreement. Accordingly, the Donor does hereby assign, transfer and pay over to the Trustee the sum of $30,000, and the Trustee acknowledges receipt thereof and hereby agrees to hold, manage and distribute the same and all subsequent additions that may be made thereto as a Trust Estate upon the following terms and conditions:"
 
 
 26
 Prior to the date of the trust, Joe Louis wrote to the Trustee bank that he had seen and approved of the trust agreement, and that the same was in compliance with the terms of his property settlement with his wife Marva.
 
 
 27
 During 1948, Marva received a total of $68,561.94 from Louis' earnings. During that year she expended $69,000.00 in repairing and improving an apartment building which she owned. On January 10, 1949, Marva transferred the apartment building to a land trust for her benefit, and obtained from the Trustee a negotiable promissory note payable to bearer in the amount of $34,000.00 secured by a trust deed on the apartment house. On July 7, 1949, she transferred the note and trust deed to The First National Bank of Chicago as Trustee under Trust 38328 for the benefit of Joe Louis, Jr.
 
 
 28
 Efforts by the Commissioner to collect unpaid deficiencies in income taxes from Joe Louis were unsuccessful. On the basis that Louis was insolvent when the trusts were established, the Commissioner determined transferee liabilities against the Trustee under § 311 of the Internal Revenue Code of 1939, 26 U.S.C. § 311 to the extent of the value of the property transferred by Louis.
 
 
 29
 The Tax Court affirmed the Commissioner's determination of transferee liabilities. The Court held that Louis was the actual donor and the transferor of property of both trusts; that Marva performed no substantial services under the Manager's agreement, and held that both transfers were gratuitous and were without consideration. The Court also held that Louis was insolvent on November 21, 1947 and July 7, 1949, the dates when the trusts were created, and also on or after December 3, 1953 the date notices of transferee's liability were issued to the Trustee by the Commissioner.
 
 
 30
 In addition to the Trustee's appeal there is also an appeal by the Commissioner, on the theory that if Louis was not the donor, then Marva was, and accordingly she would be liable for gift taxes. The Commissioner describes his appeal as a protective appeal.
 
 
 31
 A "transferee" within the meaning of § 311(a) of the Code has been judicially defined as one who takes the property of another without full, fair and adequate consideration to the prejudice of creditors. See Mertens, Law of Federal Income Taxation, 1958, Chap. 53, § 53.10. Section 311 provides the Commissioner with a substitution for a creditor's bill to set aside a fraudulent conveyance and subject the property to the transferor's tax liability. Section 1119(a) of the Code, 26 U.S.C. § 1119(a) places the burden of proof on the Commissioner to show in the case at bar that the trusts were liable as transferees.
 
 
 32
 In 1945, when the agreements were executed, it was realized by all concerned that, barring death or disability, Joe Louis would have future earnings in a large amount. The record shows that in the four years following the date of the agreements, Louis' net income was in excess of One Million Dollars. Although Louis may have been insolvent on the basis of existing tangible assets, it is clear that in 1945 Marva's rights of support were of substantial value.
 
 
 33
 It is clear that Louis had no intention of defrauding creditors by executing the agreements in 1945, or later, in making payments thereunder to Marva. However, intent or motive usually is immaterial if the transfer does, in fact, impair the rights of creditors. Landers Frary & Clark v. Vischer Products Co., 7 Cir., 201 F.2d 319, 324.
 
 
 34
 The agreements signed by Louis and Marva are not ambiguous. The preamble states the "settlement agreement" of which the "management agreement" is a part, is an agreement settling all questions of alimony, maintenance, support and other rights of Marva. Under the agreement, Marva released Louis from all claims for maintenance, support, alimony and dower. This was a valid consideration for the payments which Louis promised to make to Marva for her own use and which he did make. These payments were not gratuitous but were in discharge of a legal obligation to support his wife.
 
 
 35
 By the express terms of the agreement, half of any payments by Louis to Marva were to be placed in trust for their daughter Jacqueline. Although Marva was in a position to waive or surrender her support rights in exchange for payments to be made, the child Jacqueline was not in any such position. No matter what provision Louis might make in the form of trusts, he still would have the legal oblilgation to support Jacqueline.
 
 
 36
 On November 21, 1947, the date when the trust for the benefit of Jacqueline was created, Louis was insolvent, having liabilities in excess of $550,000.00 and assets of approximately $89,500.00. He was also hopelessly insolvent on July 7, 1949 when the trust for the benefit of Joe Louis, Jr. was created. On the dates when each of these trusts was created, Louis and Marva were living together as husband and wife, they having been remarried in 1946. Furthermore, there was nothing in the agreements executed in 1945 which referred to a trust to be created for Joe, Jr., as undoubtedly, at that time, neither party contemplated remarriage.
 
 
 37
 Although there was adequate consideration to support payments that were made by Louis to Marva for her own use and benefit, we can find no such consideration as to the funds used to establish the trusts for the benefit of Jacqueline and Joe, Jr. Under no circumstances can the transfer of funds for Joe, Jr. be considered to be in satisfaction of Marva's support rights. There was no consideration moving from Marva to Louis for the transfer of funds creating the second trust.
 
 
 38
 As to the trust for the benefit of Jacqueline, Marva, at no time, had a beneficial interest in the $30,000 which was the sum used to establish the trust for Jacqueline. As the Tax Court found, she was acting as Louis' agent. She obtained Louis' approval before accepting the trust.
 
 
 39
 It is our opinion that the Tax Court was correct in holding the Trustee of each trust liable as a transferee of property of Joe Louis.
 
 
 40
 Affirmed.
 
 
 41
 FINNEGAN, Circuit Judge (concurring).
 
 
 42
 The base-line from which I set out in deciding my view of this case is Rule 52, Federal Rules of Civil Procedure, 28 U. S.C., and being satisfied that the findings of fact made by the judge of the Tax Court cannot be classed as "clearly erroneous" they remain undisturbed. Wisconsin Memorial Park Co. v. Commissioner, 7 Cir., 1958, 255 F.2d 751. Indeed the Trustee-appellant's brief writers tell us that "No questions of fact or credibility are raised," and in substance, the legal effect of such facts constitute the nub of the appeal.
 
 
 43
 Actually the Tax Court proceedings consisted of several cases consolidated for trial, yet theoretically divided between witnesses in the transferee and gift tax cases. In the latter the burden was on petitioner, Marva Trotter Barrow Spaulding, former wife of Joe Louis Barrow, while the government had the burden of proof in the transferee cases involving Trusts numbered 36358 and 38328. [26 U.S.C. § 1119 (1946 ed.)]. The combined record is lengthy containing as it does the testimony of numerous witnesses, including significant evidence given by Mrs. Spaulding and Joe Louis, implemented by key documentary exhibits. This record supports the findings of fact.
 
 
 44
 Consequently what remains are questions of interpretation and the propriety of inferences drawn by the Tax Court judge from the evidence before him. I am expressing my views separately from, and with all due deference to, my brothers because I think affirmance is correct but that it can be put on broader grounds. Stern v. C. I. R., 6 Cir., 1957, 242 F.2d 322, awaiting disposition in the Supreme Court, mentioned by Commissioner, concerns the familiar problem of whether the beneficiary of a life insurance policy can be held as a transferee of the insured taxpayer after his death. Both sides see varying degrees of relevancy in Stern, yet I think the matter before us can stand on its own ground.
 
 
 45
 When the government occupies creditor status for unpaid federal income taxes it can invoke § 311, I.R.C.1939 [26 U. S.C. § 311 (1952 ed.)] and reach assets transferred by the debtor-taxpayer when the latter is insolvent or if the shift of assets produces insolvency. In other words, familiar principles governing fraudulent conveyances in fraud of creditors are brought into the Code framework. Section 311, and incidently its 1954 Code counter-part, is a summary weapon supplied by Congress to the Commissioner for collecting unpaid taxes from persons who dissipate their estates to the detriment of the creditor-government rights. Before creation of that statutory remedy the government was forced to proceed "by a creditor's bill against the transferee, seeking to impress the property transferred with a trust for the payment of the taxpayer's debts." 9 Merten's Federal Income Taxation, chap. 53, § 53.01 (1958).
 
 
 46
 Relying upon § 311 of the Code, Commissioner seeks to collect from The First National Bank of Chicago, Trustee, under Trusts No. 36358 and No. 38328, money of Louis in respect of his delinquent income taxes to the extent of the value for the property transferred to the Trustee as the initial corpus of each Trust. Briefly the Commissioner is saying that while Louis was insolvent, delinquent, and owing federal income taxes, he dissipated his assets by setting up the two trusts for his children. Obviously the Trustee, in position of transferee, can only successfully resist the Commissioner's claim by establishing that the corpus was transferred for value — or, by showing there was full, fair and adequate consideration for the transfer, which, in turn, would eliminate prejudice of the creditor's rights. Here, the Trustee struggles for supplying consideration by blurring the release of Marva's (the former wife of Louis) support rights, approved in a Cook County, Illinois divorce decree, with the consideration required to rescue the children's Trusts. But from this record I am satisfied that Marva had no personal interest in the two trusts, save for adhering to her contractual commitments with Louis. Her failure to set up these trusts (the second one by virtue of continuing the agreement) would choke off the flow of money coming to her under the "Management Agreement." The "Settlement Agreement" makes this readily apparent:
 
 
 47
 "It is mutually agreed that in the event that any time during the term of the said Manager's Agreement between Marva Trotter Barrow, as manager, and Joe Louis Barrow, as boxer, that there be any default or breach on the part of Marva Trotter Barrow to be kept and performed with respect to the provisions hereinbefore set forth relating to the minor child of the parties hereto, that in such event the said manager's contract, may, at the option of Joe Louis Barrow, be immediately revoked, terminated and held for naught."
 
 
 48
 It is not the argumentative value of Marva's support rights that control, but the undisputed fact she could only retain 12½%. Under the Management-Settlement Agreements Marva acted as a conduit for carrying the money earned by Louis to the Trustee, she was his agent and he the donor. The arguments concerning child support are tenuous and State judicial approval of the settlement agreement does not undercut the Commissioner's position. While the Illinois court was satisfied with Louis' provision for his children, that approval cannot override the legitimate claim of the Federal Tax Collector. We have nothing to do with policy matters.