ROBERT LESLIE BOWLIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ANN W. BOWLIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55571, 65486. Filed October 27, 1958.

*Ward Hudgins, Esq.,* and *Richard H. Frank, Jr., Esq.,* for the petitioners.

*James R. Harper, Esq.,* for the respondent.

OPINION.

TURNER, *Judge:* The respondent has determined deficiencies in income tax and additions thereto for fraud against petitioner Robert Leslie Bowlin for the years 1942 through 1947, and his determination of such deficiencies is presumptively correct. The parties are agreed, however, that in the absence of proof that Bowlin's returns for the said years were false and fraudulent with intent to evade tax, the statute of limitations has run as to all years, and the burden of proving fraud is on the respondent.

In their reply brief, the petitioners admit that Bowlin's books and records did not reflect all of the receipts from his medical practice and that they were inadequate for the determination of his taxable income. They also admit that the income tax returns filed by him did not show his entire income. Classifying Bowlin's underreporting of his income has "undeniable" negligence, they contend that the respondent has failed to meet his burden of proving that the returns were false and fraudulent with intent to evade tax.

From the evidence of record and the facts shown thereby, we are convinced that Bowlin's returns for all of the years herein were false and fraudulent with intent to evade tax, and we have so found.

Taking into account the expenditures from Bowlin's checking account for the taxable years, together with the insurance premiums admittedly paid in cash and not from the bank account, the items of expense claimed on his returns which were not traceable to the bank account, and the amounts expended for United States war bonds not traceable to either Bowlin's or Ann's bank account, there is an indicated total of expenditures for each of the years in question greatly in excess of reported gross income, and for each of the years 1944, 1945, 1946, and 1947, of more than twice the reported gross income, and for each of the last 3 such years, quite substantially more than twice the gross income reported.

Furthermore, there can be no doubt, we think, that such indicated excess of expenditures over reported gross income represented un-

reported income in substantial part, if not in toto, as the respondent has determined. In response to an inquiry by the special agent assigned to the case, made at a conference on January 5, 1950, as to whether Bowlin had any funds on hand at the beginning of 1942, it was Bowlin's best estimate, subsequently made in writing, that in 1942 he had about $5,000 in a lock box, which, beginning with $1,200 collected as a result of an automobile accident some years previously, had from time to time been saved in small amounts. The evidence further shows that when opened in 1949, the lock box then contained $5,000 in currency. It would thus appear, and the petitioners, in effect, so acknowledge in their reply brief, that Bowlin did not draw the money to cover the very substantial expenditures in excess of reported gross income during the taxable years from any funds accumulated in prior years. It is to be noted also that none of the returns reflect any sale or liquidation of property, from which such funds could have been derived. Furthermore, the petitioners have both alleged, in verified petitions herein, that throughout the period in question, income from the practice of medicine, plus "certain" interest and dividends, constituted Bowlin's sole source of income. In that connection, it is to be noted that $12.14, reported in 1942, constituted the only item of interest reported for the taxable years, and that whatever the amount of dividends received, they were wholly unreported.

When considered with other facts of record, it is of significance, we think, that for each of the years the unreported income is fully accounted for by nondeductible expenditures for United States war bonds and insurance premiums, considerable portions of the latter being premiums paid in advance, and that these expenditures were, except for negligible amounts, made in cash from income received in cash or, possibly to some extent, from the proceeds of checks which did not clear through Bowlin's bank account. Bond purchases increased from $3,787.50 in 1942, $3,412.50 of which was in currency, to $7,500 for 1943, all of which was in currency. Insurance premiums, on the other hand, were $531.25 for 1942, and $793.16 in 1943, all of which were paid by check. In 1944, the bond purchases remained at $7,500, all of which was in currency, whereas insurance premiums paid jumped to $7,655.36, of which $4,921.38 was in currency. On each of 3 policies, 8 annual premiums were paid, of which 7 were advance premiums, as compared with the payment of current premiums only in each of the 2 years preceding, while on 2 other policies 14 annual premiums were paid, in addition to the current premiums. For 1945, the expenditures for bonds were $7,537.50, all of which was in currency, while insurance premium payments increased to $11,443.67, of which $9,502.81 was in cash. On 1 policy, 13 annual premiums

were paid in advance, in addition to the current premium, and by a payment of $6,168.20 1 policy became a paid-up policy. For 1946, only $768.75 was expended for bonds, as against $15,997.37 for insurance premiums, only $363.20 of which was paid by check, and of the premiums so paid, 4 on 1 policy, 5 on another, and 12 on a third were advance premiums. For 1947, there were no bond purchases, as compared with the payment of $14,868.72 for insurance premiums, of which $14,505.52 was in currency.

It is to be noted also, and is not without significance, we think, that as greater portions of Bowlin's income bypassed his books and his income tax returns, similarly there were noticeable increases in the amounts of his currency transactions, which likewise were not reflected by his records, and that whereas his deposit slips for 1942 and 1943 indicated that he did make deposits of cash on occasions, no cash was included in any of his deposits in 1944, 1945, 1946, and 1947.

Patently, the source of some substantial part of Bowlin's unreported income represented fees from patients treated by him in Memphis hospitals during the taxable years. In fact, most of his hospital cases were never recorded on his books. A check of the records of Memphis hospitals disclosed that for the years 1942 through 1947 Bowlin's hospitalized patients were 662 in number, 391, or approximately 59 per cent, of which do not appear in Bowlin's accounts. Also, just as there had been a steady increase in Bowlin's income and in his nondeductible currency expenditures from a low in 1942 to a peak in 1945, there was a corresponding increase in the number of hospital patients. And particularly noticeable is the fact that there was a corresponding rise, from year to year, in the percentage of such patients which were never carried by Bowlin into his accounts. In 1942, 34 of 73, or 46.5 per cent, of Bowlin's hospital patients were omitted by him from his books. Sixty-nine of 122, or 56.5 per cent, were omitted in 1943; 77 of 132, or 58.3 per cent, in 1944; and 106 of 149, or 71.1 per cent, in 1945. In 1946, however, when the number of Bowlin's hospital patients dropped to 83, which was only 10 above the number for 1942, and the number omitted by him from his accounts was 37, the percentage of omissions was 44.75, and was likewise somewhat comparable to the percentage omitted for 1942. But in 1947, when the number of such patients increased to 103, 68, or 66 per cent, were omitted by Bowlin from his books.

On brief, petitioners seek to discount the facts with respect to hospital patients, with the contention that the respondent, who had the burden of proof, has not shown that any income was received from any of the patients omitted from Bowlin's books of account. The argument, in our opinion, is without merit on its face. It would be most unrealistic and incredible to believe and conclude that there was an

absence of income from 59 per cent, or 391 of 662, of Bowlin's hospital patients during the taxable years, and that the lack of income from those patients was the reason for their omission from his accounts and records.

It is argued for the petitioners that the respondent in his determination of Bowlin's income for the various years herein was in error in including the amounts deposited in the two savings accounts and the checking account of Ann Bowlin and in including the amounts represented by the expenditures for United States war bonds which were issued in the names of Bowlin and Ann Bowlin, especially those purchased "at Mrs. Bowlin's bank and clearly indicating her as primary payee with Doctor Bowlin as alternate payee," and that if these amounts be eliminated from the total income for the respective years as determined by the respondent, a substantially different picture is presented, so as to demonstrate error in the respondent's determination of fraud.

A mere glance at the facts will disclose that the deposits in Ann Bowlin's two savings accounts and her checking account were so small that their inclusion or exclusion from consideration, insofar as the fraud determination is concerned, would be of no moment. Neither is there any significance in the fact that a goodly portion of the bond purchases were made at the First National Bank and the Union Planters Bank where, during all of the taxable years in one instance, and some of the taxable years in other instances, Ann had small amounts on deposit. As a matter of fact, most of the bonds purchased at the Union Planters Bank were purchased prior to 1945, which was the year in which Ann's two accounts in that bank were opened. Furthermore, Bowlin likewise had a savings account at the First National Bank, in which there were balances at the beginning of the years 1942, 1943, and 1944 which were at least three times greater than the balances on those dates in Ann's savings account at that bank. But even in the case of those balances, they were so small as to be insignificant when related to the amounts of the bond purchases, and it is patent that the deposits in Ann's savings account at the First National Bank were in no way related to the bond purchases made. In short, it is not the place of purchase, or even the identity of the person who physically made the purchase, which is significant, but the course of the funds used in making the purchase. And with respect to Ann, the evidence strongly indicates that she was without any substantial funds and had little, if any, income. In fact, the record is persuasive that her income was limited to such small amounts of interest as might have accrued on her two small savings accounts. Support for such a conclusion is to be found in the fact that Bowlin, on his income tax returns, claimed Ann as a dependent for all of the years herein, and in

the further fact that during the taxable years all payments on an investment contract in Ann's name with the Investors Syndicate of Minneapolis were made by checks drawn on Bowlin's personal checking account.

In contrast, Bowlin, during the taxable years, did have a source for such income, and from such source he was earning income substantially in excess of that being reported by him. And not without significance, we think, is the fact that the bond purchase program ran concurrently with the war years, reaching a level of $7,500 in 1943 and continuing at that level through 1945, whereas the buildup of the insurance program on a substantial scale, particularly the payment of advance premiums, began in 1944, increased very substantially in 1945, the year the war ended, and was approximately doubled in 1946 and 1947, in the latter of which years it had wholly superseded the bond-buying program. That the insurance premiums were paid by Bowlin and from his funds is a stipulated fact. We are satisfied and convinced by the facts of record that most, if not all, of the bonds were purchased by Bowlin and out of his income, as the respondent has determined, but even if on some occasions Ann might from some undisclosed source have supplied funds for a bond, the picture as to fraud on the part of Bowlin would not, in our opinion, be changed.

As indicating that Bowlin's failure to report all of his income was due to negligence, not fraud, counsel for petitioners, on brief, strongly rely on *Wiseley* v. *Commissioner*, 185 F. 2d 263, the tenor of the argument being that "[a]s is well known to everyone," there was a shortage of doctors in the war years, and the available doctors were compelled to work long hours and to care for an unusually large number of patients; that Bowlin's "office was sparsely furnished, and staffed solely by a woman employee who did odd jobs, kept the books, and acted as receptionist"; and that "[t]he entire picture painted by the record is that of a harried physician attempting to minister to those who needed him to the neglect of his books and records."

A major difficulty with that contention is that petitioners' counsel seek to apply to the record in this case evidence which was of record in the *Wiseley* case but which is wholly absent from the record here. The record does show that Bowlin's office was not an elaborate one and that he had only the one employee, and we not only do not doubt, but accept as true, that during the war years the number of patients attended by Bowlin increased substantially over the number of such patients in the years preceding, but unlike the record in the *Wiseley* case, wherein the picture painted by the evidence was that of a "harried physician attempting to minister to those who needed him to the neglect of his books and records," the record here is wholly devoid of any evidence to that effect, or to the effect that increase in the

number of patients attended by Bowlin had anything to do with his substantial underreporting of his income. Both of the petitioners in the instant case were present throughout the trial, but neither took the stand to testify in refutation of any part of the respondent's determination, or in refutation or explanation of the facts which are shown of record, and which have been found as above set forth. Facts which are of record are not overcome or refuted by argument for which there is of record no factual basis, and this is all the more evident in a case where any such explanatory or refuting facts would particularly be within the possession and knowledge of the party making the argument. See in that connection *Katz* v. *Commissioner*, 188 F. 2d 957, and *Cohen* v. *Commissioner*, 176 F. 2d 394, affirming 9 T. C. 1156.

After considering the evidence and the facts shown thereby, including the comparatively very substantial amounts of income which bypassed both Bowlin's books and records and his income tax returns, the very large portions of his income received in cash or by checks which did not clear through his bank account, the substantial portions of his expenditures which were made in currency from such income and not recorded on any of his records, and the practice, after the first 2 taxable years, of withholding all cash from his bank account, the deposit slips for which were all prepared by him, the pattern of his nondeductible expenditures in the form of investments in bonds up through the war years and the prepayment of insurance premiums which reached large proportions as the war was drawing to a close and continued in comparable amounts through the remaining taxable years, and which in themselves for most of the taxable years exceeded his total reported income, we are convinced that Bowlin did most, if not all, of these things for the deliberate purpose of avoiding income tax and his income tax returns for all of the years before us, namely, 1942 through 1947, were false and fraudulent with intent to evade tax. We have so found, and so hold. In reaching our conclusions as to fraud, we have given no weight to the criminal proceedings against Bowlin.

As to the deficiencies in tax, the respondent's determination is presumptively correct, and the burden of proving error therein is on the petitioners. In their briefs, the petitioners have, as indicated above, contended that the respondent erred in his determination of deficiencies in certain respects. Not only is there an absence of proof to support or sustain those claims of error, but most of the various elements going to make up the deficiencies are admitted by the petitioners. The respondent's determination of the deficiencies in tax for the years 1942 through 1947 is accordingly sustained.

With respect to the additions to tax for fraud for the said years, what has been said above in determining that the returns filed were false and fraudulent with intent to evade tax, is equally applicable and

forceful in showing that a part of the deficiency determined by the respondent for each of taxable years is due to fraud with intent to evade tax. We have so found.

The remaining question is whether petitioner Ann W. Bowlin is liable as transferee for the deficiencies in tax and additions thereto in question.

The burden of proving transferee liability is on the respondent. Sec. 1119 (a), I. R. C. 1939. He must show that there was a gratuitous transfer of assets from Bowlin to his wife and that Bowlin was either insolvent at the time of the transfer, or was rendered insolvent by such transfer. *Mary Stoumen*, 27 T. C. 1014, 1018. Respondent must also show the value of the assets at the time they were transferred. *R. E. Burdick*, 24 B. T. A. 1297. Moreover, where it has been asserted that an addition to tax for fraud is due from the transferor, it is necessary for the respondent to prove that a part of the deficiency is due to fraud with intent to evade tax. What has been said with respect to fraud on the part of Bowlin is equally applicable here.

A determination of the liability of Ann Bowlin as the transferee of Bowlin under Tennessee law is in turn a determination of her transferee liability here. *Commissioner* v. *Stern*, 357 U. S. 39.

With respect to what constitutes a fraudulent conveyance sufficient to impose liability upon a transferee, Tennessee Code Annotated section 64–312 (1954) provides as follows:

*Conveyances by insolvent without fair consideration declared fraudulent.* Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

The Tennessee Code further provides that assets of a debtor means property not exempt from liability for his debts; that a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured; and that a defrauded creditor may disregard the conveyance and attach or levy execution upon the property conveyed. Tenn. Code Ann. secs. 64–308, 64–309, and 64–317 (1954).

The transferee-petitioner has not attempted to show that the deficiencies determined against her husband-transferor are not due from him. In fact, she has offered no evidence, but relies on the argument that the respondent has failed to prove that she is liable as transferee.

The evidence shows that after the investigation of Bowlin's income tax liability was begun and the examining agent had made his report on January 6, 1950, Bowlin started disposing of his assets. In 1950,

Bowlin and Ann owned war bonds that had maturity values in the aggregate amount of $36,100, for which $27,075 had been paid. In December 1950, 10 bonds, having a maturity value of $1,075, issued in the name of Ann and a third party were cashed. The bonds had accrued interest over a period ranging from 3 to 5 years. On September 6, 1952, 10 bonds issued to Bowlin and Ann, having a maturity value of $10,000, were cashed. Interest had accrued on these bonds over a period of 8 to 9 years. Three days later, on September 9, 1952, 29 bonds issued to both Bowlin and Ann, and having a face value in the aggregate amount of $10,000, were cashed. Interest had accrued on these bonds over a period of 9 to 10 years. In May 1953, a $25 bond which had been issued in both of their names in September 1942, was cashed. In July 1953, 15 of their bonds, having a total maturity value of $15,000, were cashed. Interest had accrued on these bonds over a period ranging from 7½ to 9 years. Thus, the entire $27,075 that had been put into the $36,100 face amount of bonds had been received back, plus the interest that had accrued thereon. All of the bonds had been disposed of before Bowlin had executed his protest to the proposed deficiencies on November 27, 1953. During their investigation of Bowlin's tax matters, the agents had discussed some matters with Bowlin, the last discussion having been on January 5, 1950. It is noted that Bowlin was criminally prosecuted in September 1952, in a Federal District Court, for violation of section 145 (b) of the Internal Revenue Code of 1939, with respect to some of the tax years herein, and because of a mistrial, was again tried in the same court for the same offense in January 1953. He was fully aware of the additional taxes he owed the Government when he conveyed his interests in the home property at 816 Avalon Street and the property at 887 North 7th Street to his wife on November 21, 1953. At the time of the transfers the fair market value of the said properties was $11,000 and $6,500, respectively.

Furthermore, on October 11, 1954, which was less than 3 weeks after the deficiency notice had been mailed to Bowlin on September 24, 1954, Bowlin transferred to his wife, without consideration, all of his incidents of ownership in his life insurance policies having cash surrender values in the net aggregate amount of $45,268.07. At the time of their transfer, premiums had been paid in advance on some of the policies in the aggregate amount of $8,103.87. The transfers resulted in Bowlin's becoming insolvent and being unable to pay his debts. On November 1, 1954, Bowlin admitted to the Government that he was insolvent and unable to pay the deficiencies in income tax and additions thereto for fraud. Adjustments made for income tax liability, including the addition to tax for fraud, are proper in determining insolvency, though the definite amounts may not be known

at the time of the transfers. *Vestal* v. *Commissioner*, 152 F. 2d 132; *J. P. Quirk*, 15 T. C. 709, affirmed per curiam 196 F. 2d 1022.

Under the Tennessee statute, when Bowlin made the transfers without consideration to his wife, he made fraudulent conveyances. Furthermore, it is significant that within a short time after the transfer of the insurance policies to her, she requested payment of the advance premiums in the amount of $8,103.87, and negotiated loans on the various insurance policies in the net aggregate amount of $45,666.75, receiving checks for the respective amounts from the company on December 20, 1954. It thus appears that she was assisting in a plan to prevent the Government from reaching any assets of her husband in the satisfaction of his tax obligations. In Tennessee, when a grantee joins in a fraudulent conveyance, a creditor of the grantor may recover the value of the property fraudulently conveyed from the grantee. *Hartnett* v. *Doyle*, 16 Tenn. App. 302, 64 S. W. 2d 227.

Ann Bowlin contends that under the laws of Tennessee [1] Bowlin's life insurance policies, including the cash surrender values thereof, were not property which would be reached by the creditors of the insured.

In support of that contention, she cites and relies on *Stern* v. *Commissioner*, 242 F. 2d 322, reversing a Memorandum Opinion of this Court, and *Rowen* v. *Commissioner*, 215 F. 2d 641.

After the filing of briefs herein, the Supreme Court of the United States affirmed the Circuit Court of Appeals in the *Stern* case, *Commissioner* v. *Stern, supra*, and on the same date, rendered its decision in a companion case, *United States* v. *Bess*, 357 U. S. 51. In the *Stern* case, the Supreme Court applied the applicable Kentucky State law, and held that the widow-beneficiary was not liable as a transferee, because under the statute a beneficiary of a life insurance policy is not liable to the insured's creditors where the premiums had not been paid in fraud of creditors.

In the *Bess* case, it was held that the insured did have rights in the policy cash surrender value which he could demand and receive during his lifetime and which he could borrow against, assign, or pledge, and under the facts of that case, the beneficiary of the life insurance policy was liable for income taxes owed by the insured at the time of his death.

---

[1] Tennessee Code, Annotated (1954):

Sec. 56–1110. *Life insurance or annuity for or assigned to wife or children or dependent relatives exempt from claims of creditors.*—The net amount payable under any policy of life insurance or under any annuity contract upon the life of any person made for the benefit of, or assigned to, the wife and/or children, or dependent relatives of such persons, shall be exempt from all claims of the creditors of such person arising out of or based upon any obligation created after January 1, 1932, whether or not the right to change the named beneficiary is reserved by or permitted to such person.

In both the *Stern* and *Bess* cases the transfers were made by the deaths of the insured, and there was no evidence indicating that the premiums were paid with intent to defraud creditors, or that the insured was insolvent at any time prior to their deaths.

In the instant case, Bowlin made inter vivos transfers to his wife voluntarily, without consideration, and which not only rendered him insolvent, but were made with intent to hinder and defraud the Government. On the facts here, the Tennessee statute with respect to fraudulent conveyances is, in our opinion, clearly applicable and decisive. Bowlin's conveyances to his wife were fraudulent, and she thereby became liable as transferee, and we so hold. The cash she received from the insurance policies alone was more than sufficient to pay the income tax deficiencies and the additions thereto as determined by the respondent.

*Decisions will be entered for the respondent.*