BLANCHE S. SHARP, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81820.   Filed March 31, 1961.

*William E. Badgett, Esq.*, for the petitioner.
*George L. Hudspeth, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined liability against the petitioner as transferee of assets of her husband, W. C. Sharp, in the amount of $48,003.35.   Said liability was in respect of unpaid income taxes and additions to tax owing by said husband for the years 1934 through 1949.

The issue for decision is whether petitioner is liable as such a transferee in said amount of $48,003.35.

### FINDINGS OF FACT.

*Facts re General Background.*

Some of the facts were stipulated.   The stipulation of facts, together with the exhibits identified therein and attached thereto, is incorporated herein by reference.

Petitioner Blanche S. Sharp and W. C. Sharp (hereinafter referred to as Sharp) are husband and wife, residing in Knoxville, Tennessee.   They have been married since 1919.

In 1951 and for many years prior thereto, Sharp owned and operated two drugstores in Knoxville, as a sole proprietor, under the names of W. C. Sharp Drug Store No. 1 and W. C. Sharp Drug

Store No. 3 [1] (hereinafter referred to as Store No. 1 and Store No. 3, respectively).

In 1950 or 1951, Sharp became incapacitated; and at that time, petitioner took over the management of Store No. 1. Store No. 3 was then being managed by two employees named John Stevens and Agnes Stevens; and petitioner did not take any part in the operations of said store, either at that time or at any other time material to the instant case.

On or about December 31, 1951, Sharp was found to be legally incompetent by the County Court of Knox County, Tennessee; and on the mentioned date, petitioner was appointed by said court to be the legal guardian of his person and estate. Sharp's legal competency was restored by the County Court on December 28, 1953; but the guardianship was not terminated until September 23, 1955.

### Facts re Sharp's Tax Liability.

Sharp did not file a Federal income tax return for any of the years 1934 through 1949. On September 15, 1952, petitioner as Sharp's guardian filed a delinquent Federal income tax return for each of said years with the collector of internal revenue for the district of Tennessee. These returns disclosed an aggregate income tax liability of $38,740.12; and said amount, together with additions to tax of $10,574.58 imposed under section 291(a) of the Internal Revenue Code of 1939 for late filing of returns, was assessed against Sharp on April 13, 1953.

On October 12, 1954, respondent mailed to Sharp a statutory notice of deficiency, in which he determined deficiencies against Sharp in income tax and additions thereto for the years 1934 through 1949, as follows:

| | |
|---|---|
| Total deficiencies | $41,242.66 |
| Additions to tax: | |
| Sec. 293(b) | $20,621.32 |
| Sec. 291(a) | 10,310.66 |
| Sec. 294(d)(1)(A) | 3,409.66 |
| Sec. 294(d)(2) | 2,045.81 |
| Total additions to tax | 36,387.45 |
| Total deficiencies and additions to tax | 77,630.11 |

Sharp filed a petition with this Court in response to the above-mentioned statutory notice of deficiency; and said petition was docketed as No. 55851.

[1] At an unspecified time prior to 1951, Sharp had owned and operated a third drugstore, under the name of W. C. Sharp Drug Store No. 2. This store was liquidated prior to 1951; and neither its operation nor its liquidation is here involved.

On October 28, 1955, the above-mentioned assessments of tax and additions to tax made in April 1953, were abated for years and in amounts as follows:

| Year | Abatement of income tax | Abatement of additions to tax under sec. 291(a) | Total amount abated |
|---|---|---|---|
| 1945 | $5, 624. 26 | $1, 406. 06 | $7, 030. 32 |
| 1946 | 5, 536. 35 | 1, 386. 59 | 6, 922. 94 |
| 1947 | 9, 111. 45 | 2, 277. 86 | 11, 389. 31 |
| Total | | | 25, 342. 57 |

Subsequently, on March 12, 1958, this Court entered its decision in Docket No. 55851, pursuant to stipulation of the parties, that there were deficiencies in income tax and additions to tax—after taking into consideration all previous assessments and abatements—due from Sharp for the years 1934 through 1949, in the total amount of $53,812.63, computed as follows:

Total deficiencies _____ $22, 862. 96
Additions to tax:
   Sec. 291(a) _____ $4, 828. 66
   Sec. 293(b) _____ 20, 665. 52
   Sec. 294(d)(1)(A) _____ 3, 409. 66
   Sec.  294(d)(2) _____ 2, 045. 83

     Total additions to tax _____ 30, 949. 67

     Total deficiencies and additions to tax _____ 53, 812. 63

The net total of income taxes and additions to tax for the years 1934 through 1949, as assessed against Sharp as aforesaid, amounted to $77,784.76 (not including statutory interest thereon), computed as follows:

Tax assessed per delinquent returns (Apr. 13, 1953) _____ $38, 740. 12
Additions to tax under section 291(a), assessed in connection with
   delinquent returns (Apr. 13, 1953) _____ 10, 574. 58
Deficiencies and additions to tax assessed pursuant to Tax Court's
   decision in Docket No. 55851 _____ 53, 812. 63

     Total assessments _____ 103, 127. 33
Less: Abatements (Oct. 28, 1955) _____ 25, 342. 57

Net total tax and additions to tax assessed _____ 77, 784. 76

*Facts re Respondent's Attempts to Collect From Sharp.*

During the years 1953 and 1954, and also during the first 3 months of 1955, agents of the respondent levied upon the bank accounts, the accounts receivable, and the contents of the cash registers of both Store No. 1 and Store No. 3, in attempts to collect the taxes and additions to tax owing by Sharp. By these means, the respondent collected a total of $19,368.70.

On May 18, 1955, Sharp filed a voluntary petition in bankruptcy in the United States District Court for the Eastern District of Tennessee; and on the date the petition was filed, he was adjudicated a bankrupt by said court. In the bankruptcy proceedings, the district director of internal revenue at Nashville, Tennessee, filed a proof of claim for taxes then assessed against Sharp. On June 3, 1955, the trustee in bankruptcy sold the merchandise and fixtures of Store No. 1 and Store No. 3 to Sharp's sons, James Sharp and Jack Sharp, respectively. In July 1955, the district director was paid $5,273.17 on the claim which he had filed against Sharp in bankruptcy.

Thus, of the above-mentioned net total amount of taxes and additions to tax owing by Sharp for the years 1934 through 1949, to wit, $77,784.76, there was paid by or on behalf of Sharp, a total of $24,-641.87. Sharp has had, at all times since July 1955, a remaining unpaid tax liability for said years of $53,142.89.

Respondent's agents made extensive searches for assets belonging to Sharp, including searches of the public records of Knox County, Tennessee, and inquiries directed to banking institutions in Knoxville regarding possible bank accounts belonging to Sharp. Also, in June 1958, agents of the respondent held a conference with Sharp and petitioner, in an effort to locate assets to satisfy Sharp's tax liabilities. All of the foregoing efforts were fruitless.

### Facts re Transfers of Property to Petitioner.

On February 18, 1952, while petitioner (as guardian of Sharp's person and estate) was managing and operating Store No. 1, she opened a separate, individual bank account for herself in the Broadway Branch of the Park National Bank in Knoxville, where Store No. 1 also had a bank account. During the year 1952, petitioner made 122 deposits in said individual account. These deposits ranged in amount from $14 to $728, and totaled $20,030.90. Petitioner also deposited, in 36 transactions, $6,229.25 in said individual account during the period from January 2, 1953, to March 29, 1953, when she closed the account. Said 1953 deposits ranged in amounts from 48 cents to $597.49. All of such deposits made in petitioner's individual bank account for both years, represented receipts from the operation of Store No. 1. The record does not disclose the amount of petitioner's credit balance in said individual account at the time when the same was closed.

The only person authorized to make withdrawals from said individual account was the petitioner, and this she was authorized to do in her private and individual capacity, and not in her capacity as Sharp's guardian. Petitioner, from time to time, made withdrawals from this individual account; but the amounts of such withdrawals and the

times when the same were made, are not disclosed by the record. All of such withdrawals were used by petitioner to defray costs and expenses incident to the operation of Store No. 1.

Petitioner's purpose in opening and utilizing the above-mentioned individual account at the Broadway Branch, was to put the funds of Store No. 1 beyond the reach of the Federal taxing authorities.

Also during 1952, Sharp on each of several occasions gave petitioner a package of sealed envelopes, with verbal request that she give one of these envelopes to an individual named John E. Anderson, whenever Anderson should come into Store No. 1. Each of the envelopes contained currency. Whenever Sharp gave petitioner a package of envelopes, she put them in her desk drawer; and when Anderson came in, petitioner would either herself give him an envelope, or would instruct one of the clerks to do so. During 1952, Anderson was given one of these envelopes on 34 different occasions. The dates on which the envelopes were given to Anderson, and the amounts of money contained in the envelope given on each date, were as follows:

| Payments to Anderson in 1952 | | | |
| --- | --- | --- | --- |
| Date | Amount | Date | Amount |
| Jan. 6 | $500 | Aug. 19 | $500 |
| Jan. 9 | 1,000 | Aug. 26 | 500 |
| Jan. 26 | 500 | Sept. 2 | 500 |
| May 12 | 500 | Sept. 9 | 500 |
| May 20 | 1,000 | Sept. 16 | 500 |
| May 27 | 500 | Sept. 23 | 500 |
| June 3 | 500 | Oct. 14 | 500 |
| June 10 | 500 | Oct. 21 | 500 |
| June 17 | 500 | Oct. 28 | 500 |
| June 24 | 500 | Nov. 10 | 500 |
| July 1 | 500 | Nov. 18 | 500 |
| July 8 | 500 | Nov. 25 | 500 |
| July 15 | 500 | Dec. 2 | 500 |
| July 22 | 500 | Dec. 9 | 500 |
| July 29 | 500 | Dec. 16 | 500 |
| Aug. 5 | 500 | Dec. 23 | 500 |
| Aug. 12 | 500 | Dec. 28 | 500 |
| | | Total | 18,000 |

The purported purpose of said payments to Anderson was to have him "fix" a criminal case then pending against Sharp for failure to file Federal income tax returns. Anderson was alleged to be a used-car dealer; but at the time of the trial no such person could be found. It was admitted in the above-mentioned bankruptcy proceeding for Sharp, that all of the amounts so delivered by petitioner were delivered in her personal capacity; and accordingly, none of the amounts was included in Sharp's bankruptcy estate. Each time a payment was made to Anderson, he would give petitioner a receipt in the form of a promissory note. It was not the intention of Anderson or the petitioner that the payments to Anderson were to be loans; but rather that Anderson was to receive such payments absolutely, with no obli-

gation for repayment. The promissory notes were intended as nothing more than receipts.

Petitioner gave no consideration for any of the amounts withdrawn by her from Store No. 1, or for any of the above-mentioned amounts delivered to her by Sharp.

On November 10, 1955, petitioner opened another personal checking account in her own name at the Fountain City Bank at Fountain City, Tennessee. She was the only person authorized to draw checks on or make withdrawals from the account. During the year 1956, deposits totaling $9,095.97 were made to petitioner's account at the Fountain City bank. Of the amount so deposited, $3,240 thereof was salary which had been paid to petitioner as a clerk in Store No. 1 which (as hereinbefore found) her son James had purchased from the trustee in bankruptcy; and $1,620 of said $9,095.97 represented rental income received by petitioner. The remaining deposits, totaling $4,235.97, represented in part, advances made to petitioner by her sons and others for use in paying obligations of said individuals, and also reimbursements from these same parties for amounts paid by petitioner in their behalf. None of the amounts deposited in said Fountain City bank account was established to have come from Sharp.

*Facts re Sharp's Insolvency.*

Sharp's assets and liabilities, on the respective dates herein indicated, were as follows:

| | December 31— | | | | |
|---|---|---|---|---|---|
| | 1951 | 1952 | 1953 | 1955 | 1956 |
| *Assets* | | | | | |
| Cash: | | | | | |
| Sharp Drug Store No. 1 | $1,077.45 | $5,188.80 | $3,942.34 | (1) | (1) |
| Sharp Drug Store No. 3 | 14,022.23 | 5,477.54 | 5,615.70 | (1) | (1) |
| Accounts receivable: | | | | | |
| Sharp Drug Stores Nos. 1 and 3 | 34,898.60 | 44,055.69 | 38,504.98 | (1) | (1) |
| Inventories: | | | | | |
| Sharp Drug Stores Nos. 1 and 3 | 66,857.10 | 62,800.44 | 39,913.30 | (1) | (1) |
| Furniture and fixtures: | | | | | |
| Sharp Drug Stores Nos. 1 and 3 (Fair market value) | 3,000.00 | 3,000.00 | 3,000.00 | (1) | (1) |
| Cash surrender values of life insurance policies: | | | | | |
| Policy No. 5968809 | 1,793.40 | 1,892.21 | 1,991.02 | (1) | $179.36 |
| Policy No. 3562595 | 3,063.89 | 3,120.10 | 1,626.42 | $30.94 | 93.60 |
| Total assets | 124,712.67 | 125,543.78 | 94,593.76 | 30.94 | 272.96 |
| *Liabilities* | | | | | |
| Accounts payable: | | | | | |
| Sharp Drug Stores Nos. 1 and 3 | 43,939.22 | 59,135.80 | 43,136.62 | (1) | (1) |
| Federal taxes: | | | | | |
| Income taxes, including accrued interest | 92,095.14 | 94,575.00 | 89,921.71 | 71,521.30 | 73,851.25 |
| Employment and withholding taxes, including accrued interest | 1,898.30 | 2,305.98 | 3,368.08 | 7,266.06 | 7,672.74 |
| Total liabilities | 137,932.66 | 156,016.78 | 136,426.41 | 78,787.36 | 81,523.99 |
| Excess of liabilities over assets | 13,219.99 | 30,473.00 | 41,832.65 | 78,756.42 | 81,251.03 |

1 None.

In the bankruptcy petition which Sharp filed in May 1955, he disclosed that he had the following assets and liabilities:

*Debts*

| | |
|---|---:|
| Taxes and debts due the United States | $80, 353. 57 |
| Taxes due States, counties, etc | 635. 82 |
| Unsecured claims | 48, 018. 22 |
| Total debts | 129, 007. 61 |

*Assets*

| | | |
|---|---:|---:|
| Cash on hand | $18. 08 | |
| Bills, promissory notes, etc | 500. 00 | |
| Stock in trade | 2, 500. 00 | |
| Household goods, etc | 75. 00 | |
| Machinery, tools, etc | 1, 002. 50 | |
| Accounts receivable | 3, 173. 24 | |
| Policies of insurance | 3, 581. 48 | |
| | | 10, 850. 30 |
| Excess of debts over assets | | 118, 157. 31 |

On April 13, 1959, the respondent issued a notice of liability to petitioner, in which he determined that she was liable as transferee of assets of Sharp in the amount of $48,003.35, in respect of income tax and additions thereto, plus interest, assessed against and due from Sharp for the years 1934 through 1949.

#### OPINION.

The sole issue for decision is whether the petitioner is liable as a transferee for Sharp's unpaid tax liabilities for the years 1934 through 1949, to the extent of certain funds which she received from him.

The respondent proceeded against petitioner under section 311, I.R.C. 1939, which provides, so far as here material, as follows:

SEC. 311. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds) :

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.

\*      \*      \*      \*      \*      \*      \*

Any such liability may be either as to the amount of tax shown on the return or as to any deficiency in tax.

The burden of proving that the petitioner is liable as a transferee of assets of Sharp is on the respondent. Sec. 1119(a), I.R.C. 1939; *Marva Trotter Barrow Spaulding*, 27 T.C. 479, 493, affirmed sub nom.

*First National Bank of Chicago* v. *Commissioner*, 255 F. 2d 759. It is well settled that the existence of transferee liability is determined by State law. *Commissioner* v. *Stern*, 357 U.S. 39 (1958).

The respondent in meeting his burden must prove that the transferor was liable for unpaid Federal taxes, and that all reasonable efforts were made to collect the tax liability from the transferor before proceeding against the transferee. He must further prove that property of value was transferred to the alleged transferee without adequate consideration during or after the period for which the liability accrued; and that the transferor was either insolvent at the time of the transfer or was rendered insolvent thereby. *Bartmer Automatic Self Service Laundry, Inc.*, 35 T.C. 317; *Robert Leslie Bowlin*, 31 T.C. 188, affirmed per curiam 273 F. 2d 610 (C.A. 6, 1960).

In the instant case, the correct amount of Sharp's tax liability has been stipulated; and the efforts of the respondent to collect the tax due and owing by Sharp are patent. The bank accounts, accounts receivable, and moneys in cash registers were seized by levy. The respondent shared in the proceeds of the transferor's voluntary bankruptcy; and he sought information with regard to the collectibility of the transferor's tax liability as late as June 19, 1958. Also on the last-mentioned date, a financial statement disclosing that Sharp had no assets other than a life insurance policy having a cash surrender value of $179.36 was furnished by him to the Internal Revenue Service.

Since the assets alleged to have been transferred were cash, there can be no question as to value; and it is clear from the petitioner's testimony that she gave no consideration therefor. Sharp's liabilities are for the taxable years 1934 through 1949; and therefore, any transfers to petitioner subsequent to said years were made after the liabilities for such taxes had accrued.

As regards Sharp's insolvency, we think that the respondent has met his burden of proving such insolvency as of the time of each of the 243 transfers which are alleged to have occurred in 1952, 1953, and 1956. On December 31, 1951, the amount of Sharp's liabilities exceeded the value of his assets by $13,219.99. This, coupled with his insolvency on December 31, 1952, in the amount of $30,473, raises a presumption that he was insolvent during all of 1952, when 156 separate alleged transfers were made to the petitioner. *Bennett E. Meyers*, 21 T.C. 331, 345. Sharp likewise was insolvent on December 31, 1953, by $41,832.65; and therefore he was insolvent when each of the 36 alleged transfers occurred in 1953. At the close of 1955 Sharp's deficit was $78,756.42, and on December 31, 1956, his liabilities were in excess of his assets by $81,251.03; and thus we are satisfied that if

Sharp made any transfers in 1956, he did so at a time when he was insolvent.

The sole remaining question is as to the amount of money belonging to Sharp, which was transferred to the petitioner as a transferee. The respondent determined that $48,003.35 had been transferred. This sum may be broken down into three categories: (1) Deposits of $25,767.38 in petitioner's separate, individual Broadway Branch account, which she withdrew from Store No. 1 in the amounts of $19,538.13 in 1952, and $6,229.25 in 1953; (2) $18,000 delivered by Sharp to petitioner, and by her subsequently turned over to Anderson in 1952; and (3) $4,235.97 of the total deposits of $9,075.97 made by petitioner in 1956 in her account at the Fountain City Bank. The petitioner argues, as to the first two categories, that she did not receive these sums "personally"; and that she did not use them for her own benefit. As to the third category—the deposits in the Fountain City Bank—petitioner argues that she did not receive these moneys from Sharp.

We think that the contentions of the petitioner respecting the deposits in the Broadway Branch account, and also the moneys delivered to Anderson, are without merit. Insofar as the deposits in the Broadway Branch account are concerned, these represented the daily receipts from the operation of Store No. 1 which petitioner was managing and operating. But, instead of depositing these store receipts in the store's bank account, she withdrew and deposited them in her separate, individual bank account, as to which she alone (in a private and individual capacity) could make withdrawals for whatever use she saw fit. Moreover, she opened and utilized said separate and individual account for the sole and admitted purpose of putting the funds so deposited beyond the reach of the Federal taxing authorities.

Regarding the above-mentioned $18,000 which petitioner received from Sharp and then delivered to Anderson, both sides agree that this money had its source with Sharp, although it does not appear just how, where, or when he got it. When petitioner received these funds, she knew that he had been adjudged incompetent. But, here again, she did not (as she should have) put said funds either in his account, or in any guardianship account. Rather, she put them in her desk drawer, where she had absolute dominion and control over the same; where the Government and other creditors of Sharp could not reach them for the reason that said creditors did not know of their existence; and where such funds could be, and actually were, disbursed by her to Anderson in defeat of the Government's claim thereto. In this situation, we think that petitioner's action in taking over said $18,000 amounted to a conversion of said amount to herself, as a transferee of assets of Sharp.

We have not found, nor has counsel advised us of, any Tennessee case involving a fraudulent conveyance by an incompetent person to an individual who at the time was also acting as guardian of such incompetent person. But we are fully satisfied that the transfers above considered fall within the Tennessee statute which defines fraudulent conveyances. Section 7274 of the then applicable Williams Tennessee Code, Annotated (1934), provided as follows:

7274. *Conveyances by insolvent.*—Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Said Tennessee Code of 1934 further provided that the assets of a debtor means property not exempt from liability for his debts; that the term "conveyance" includes "every payment of money"; that a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured; and that a defrauded creditor may disregard the conveyance and attach the property conveyed. Tenn. Code Ann. secs. 7271, 7272, 7280 (Williams, 1934). It is clear that, in Tennessee, a conveyance by which the grantor puts all property subject to legal process out of his hands, with intent to hinder and delay his existing creditors, is fraudulent as to them. *Harnett* v. *Doyle*, 16 Tenn. App. 302, 64 S.W. 2d 227.

Also, in *Estate of L. E. McKnight*, 8 T.C. 871, 874, which involved the alleged liability of a Tennessee transferee, this Court pointed out that the important consideration is not the fact that the transferee may not have taken full title to the property, at least in equity, because the transferee's liability is "not for a tax, but to make good the value of assets taken by it and to which it was not entitled."

We have no doubt, from the testimony presented in the present case, that the petitioner was assisting Sharp in a plan to prevent the Government from reaching his assets, as to which the Government had a prior right to have the same applied in satisfaction of his Federal taxes. This Court held in *Robert Leslie Bowlin*, *supra*, which involved the law of Tennessee with respect to fraudulent conveyances and transferee liability, that where a grantee joins in a fraudulent conveyance, the grantor's creditors may recover from the grantee the value of the property fraudulently conveyed.

The petitioner asserts by way of defense, that she is not liable as a transferee, either as to the money which she withdrew from Store No. 1, or as to the money which she received from Sharp and thereafter turned over to Anderson, because no part of such money was ever used for her own benefit. But such contention does not pro-

vide a legal defense. It is well settled that a transferee is not relieved from liability by showing that he or she used the transferred moneys or assets in satisfying bills or debts of the transferor, where such debts or obligations of the transferor did not have priority over claims of creditors (such as the Government's claim for taxes). *Fada Gobins*, 18 T.C. 1159, affirmed per curiam 217 F. 2d 952 (C.A. 9, 1954). Petitioner has not here established that any expenditure which she made on behalf of Sharp was for a purpose that had legal priority over the Government's tax claim.

Finally, we turn to the deposits made by the petitioner in her Fountain City bank account in 1956. Respondent's main reliance, with regard to these deposits, is upon certain general statements alleged to have been made by the petitioner during the course of a conference with respondent's agents to the effect that everything petitioner had, came from Sharp. Respondent also points to testimony of the petitioner that she borrowed against one of Sharp's insurance policies in 1955 and deposited the proceeds in the Fountain City account. On the other hand, however, there is evidence that the loan on the insurance policy was made about 5 months prior to the time when petitioner opened the Fountain City account. Furthermore, the bank statement for the Fountain City account establishes that the 56 deposits therein were of relatively small odd amounts; and this tends to square with petitioner's testimony that such deposits (other than those which represented her salary and her rentals) consisted of amounts advanced to her by her sons and others (not including Sharp) for use in paying their obligations, and of reimbursements to her from said parties for payments which she had theretofore made on their behalf. We think that the respondent has not borne his burden of establishing that any of the deposits made in the Fountain City bank account originated in transfers from Sharp.

We hold, on the basis of all the foregoing, that petitioner is liable as a transferee of assets of W. C. Sharp, to the extent of $43,767.38, representing (1) the deposits of store receipts in the amount of $25,767.38 made in 1952 and 1953 in her separate individual account in the Broadway Branch of the Park National Bank; and (2) the $18,000 which Sharp transferred to her, and which she thereafter delivered to Anderson. We further hold that petitioner is not liable as a transferee, in respect of the deposits in the net amount of $4,235.97, made in her account at the Fountain City Bank.

*Decision will be entered under Rule 50.*